## In re HOWARD.

(Circuit Court, S. D. New York. October 19, 1894.)

1. IMMIGRATION — CONTRACT LABORER — "PERSONAL OR DOMESTIC SERVANT" — WHAT CONSTITUTES—UNDERCOACHMAN.

An "undercoachman," whose duties are, partly, to assist in keeping stables, horses, and carriages in good order, but principally to drive the horses when his employer or any of his family go out in carriages, and to accompany on horseback the younger members of the family when they go out on horseback, and who boards with his employer's coachman, and sleeps in a room over the coach house, is a "personal or domestic servant," within the meaning of St. 1885, c. 164, prohibiting the immigration of aliens under contracts for labor, and providing that the provisions of the act shall not apply to "persons employed strictly as personal or domestic servants."

2. SAME — PROHIBITED PERSON — DECISION OF SECRETARY OF THE TREASURY — WHEN CONCLUSIVE.

Under St. 1888, c. 1210 (amending St. 1885, c. 164, as amended by St. 1887, c. 220), which authorizes the secretary of the treasury, "in case he shall be satisfied" that an immigrant "has" landed contrary to the prohibition of St. 1885, c. 164, as amended, to cause him, within a year after landing, to be taken into custody and deported, the determination of the secretary of the treasury as to whether or not the immigrant is a prohibited person is conclusive, and will not be reviewed by the courts.

Petition by John James Howard for a writ of habeas corpus to obtain his release from custody into which he was taken by order of the secretary of the treasury, to be returned to England, from which country it was claimed he came in violation of the contract-labor law. Writ dismissed, and petitioner remanded.

Wallace Macfarlane and Wm. H. Cochrane, U. S. Atty., for commissioners.

Benj. F. Tracey and Frank Platt, for relator.

LACOMBE, Circuit Judge. The federal statute of 1885 (chapter 164) and the amendments thereto (chapter 220 of 1887 and chapter 1210 of 1888), with some additional provisions contained in chapter 551 of 1891, make up what is generally referred to as the "Contract-Labor Law." That law undertakes to protect per-

sons performing labor or service here against competition from abroad by prohibiting the importation or migration of aliens or foreigners under contract or agreement to perform labor or service made prior to such importation or migration. All kinds of labor or service, however, are not within the prohibiting clauses of the statute. The first section of the act of 1885 does, it is true, use the phrase "labor or service of any kind;" but congress, by a specific enumeration, has declared that certain classes of persons performing labor or service shall not be affected by the provisions of the statute; and it has been held that, by unexpressed intention, congress also excepted other classes, not thus enumerated. Church of Holy Trinity v. U. S., 143 U. S. 457, 12 Sup. Ct. 511. The act of 1885 expressly declares that the provisions of that act shall not "apply to  *  *  *  persons employed strictly as personal or domestic servants." No subsequent act has in any wise qualified or repealed this provision, and persons thus employed have therefore not been forbidden by congress to enter. These contract-labor statutes have provided summary methods for preventing the entry into this country of persons within the prohibited class, and for the arrest and deportation of such persons who may have succeeded in effecting an entrance contrary to the prohibition. Thus, the act of 1888 authorizes "the secretary of the treasury, in case he shall be satisfied that an immigrant has been allowed to land contrary to the prohibition of that law, to cause such immigrant within the period of one year after landing or entry, to be taken into custody and returned to the country from whence he came," etc. The relator is held under a warrant issued in accordance with this last-quoted section, and the return to the writ of habeas corpus avers that the secretary of the treasury, from proofs submitted to him, became satisfied that the relator came into the country from England, contrary to the prohibition of the contract-labor laws. The relator insists that the secretary of the treasury had no jurisdiction to issue such a warrant in his case, because, although an alien immigrant, he was not, as he contends, within the prohibited class; and that the provisions of the statute touching arrest and deportation do not apply to those who belong to the excepted class of "persons employed strictly as personal or domestic servants." Courts, upon habeas corpus, will always look into the question of jurisdiction, and relator, therefore, has offered evidence in support of his answer to the return.

Whatever may have been the case made before the secretary, it appears from the evidence taken in this court that relator is in the employ of Mr. L. P. Morton, a resident of Rhinecliff, in this state, a contract for his employment having been made before entry into this country; that he is employed as "undercoachman;" that his duties consist partly in assisting to keep the stables, horses, and carriages in good order, and principally in driving the horses when his employer or any of his employer's family go out in one of the carriages. When the younger members of the family go out on horseback, he accompanies them, also on horseback. Apparently he has no other duties. He produces nothing. He does no work

on the farm, or in the garden, or in the dairy, as in Case of Cummings, 32 Fed. 75. Under the sole direction of Mr. Morton and of Mr. Morton's family, he performs services which minister exclusively to their personal comfort and enjoyment. He lives at his employer's residence, in Rhinecliff, boarding with the coachman in a small cottage of Mr. Morton's, immediately adjoining his coach house, and sleeps in a room over the coach house, where two of Mr. Morton's cooks also have their rooms. Upon such proof as this,—and there being no dispute here as to the facts,—it seems entirely clear that relator is employed "strictly as a personal or domestic servant."

But it does not follow that he should be discharged from custody. The language of the statute above quoted from (chapter 1210 of 1888) is peculiar. It provides for a return, not of the immigrant who has landed contrary to the prohibition, but of an immigrant as to whom the secretary of the treasury shall be satisfied that he has so landed. In other words, the language of the act is such as to relegate to the secretary the final determination of the question whether or not the immigrant is a prohibited person. Where congress intrusts such final determination to an executive officer, the courts cannot interfere with or overrule his decision. The supreme court has recently discussed this subject generally, and thus expresses its conclusions:

"An alien immigrant, prevented from landing by any such officer, claiming authority to do so under an act of congress, and thereby restrained of his liberty, is doubtless entitled to a writ of habeas corpus to ascertain whether the restraint is lawful; and congress may, if it sees fit, * * * authorize the courts to investigate and ascertain the facts on which the right to land depends. But, on the other hand, the final determination of those facts may be intrusted by congress to executive officers; and in such a case, as in all others, in which a statute gives a discretionary power to an officer, to be exercised by him upon his own opinion of certain facts, he is made the sole and exclusive judge of the existence of those facts, and no other tribunal, unless expressly authorized by law to do so, is at liberty to re-examine or controvert the sufficiency of the evidence on which he acted. It is not within the province of the judiciary to order that foreigners who have never been naturalized, nor acquired any domicile or residence within the United States, nor ever been admitted into the country pursuant to law, shall be permitted to enter in opposition to the constitutional and lawful measures of the legislative and executive branches of the national government. As to such persons, the decisions of executive or administrative officers acting within powers expressly conferred by congress are due process of law." Nishimura Ekiu v. U. S., 142 U. S. 660, 12 Sup. Ct. 336.

Power thus summarily to determine the status of an individual, without any review by a court or other tribunal, when such determination will expose him to arrest and deportation, is certainly very comprehensive. Courts, as a rule, are jealous of their prerogatives, and unwilling to find in any statute so broad a grant of power, unless it is expressed in no uncertain terms. In the statute now under consideration, however, the language used is not uncertain. It directs the return of the immigrant when the secretary of the treasury shall be satisfied that he belongs to a prohibited class. Undoubtedly, the language used does not expressly provide that the decisions of the secretary upon an immigrant's status shall be final, and not subject to review in the courts; but it is a reason-

able and necessary implication from the language which congress has used. Were there nothing before the court except the act of 1888, it might be urged that congress did not intend to confer such extensive judicial power upon an executive officer, although the language of the act would justify such a conclusion. As already seen, congress, in another section of this contract-labor law, has used language which unambiguously expressed more than was intended (Church of Holy Trinity v. U. S., supra); and it would not be surprising to find elsewhere in the law a similar instance of the incautious use of words. But the provisions of the supplementary immigration act of 1891 (chapter 551) seem to preclude a restricted interpretation of the section now under discussion, on any such theory of intent. In the eighth section of this act of 1891 it is expressly provided that:

"All decisions made by the inspecting officers or their assistants touching the right of any alien to land, when adverse to such right, shall be final unless appeal be taken to the superintendent of immigration, whose action shall be subject to review by the secretary of the treasury."

This language was held in Nishimura Ekiu's Case, supra, to confer upon the executive officers named in the act a judicial discretion, not reviewable by the courts. Since congress, in 1891, conferred such power upon subordinate executive officers, it is difficult to see why it should be held that congress did not intend in 1888 to confer like power upon the secretary of the treasury. By selecting an officer of such exalted rank as the final arbiter of the question of an immigrant's status, congress placed the power where it would be exercised with care, wisdom, and discretion; and, having the right thus to legislate upon the subject (Nishimura Ekiu's Case, supra; Fong Yue Ting v. U. S., 149 U. S. 698, 13 Sup. Ct. 1016), its grant of power should be construed as it is expressed. Where it is shown that the person proceeded against under the contract-labor law is not an immigrant, the secretary has no jurisdiction to pass upon the question. In re Panzara, 51 Fed. 275; In re Martorelli (U. S. Cir. Ct. S. D. N. Y.; Oct., 1894) 63 Fed. 437. But where it appears that such person is an immigrant, who has not been here more than one year, the secretary of the treasury has been selected by congress as the sole tribunal to determine whether he is or is not within the prohibited class.

The writ must be dismissed, and the relator remanded.