(No. 11987.—Judgment affirmed.)
JACOB KAMINSKY, Defendant in Error, *vs.* THE CHICAGO
RAILWAYS COMPANY, Plaintiff in Error.

*Opinion filed December 18, 1918—Rehearing denied Feb. 5, 1919.*

1. NEGLIGENCE—*when co-employees are not fellow-servants.*
The fact that employees of the same master occasionally work
near each other and have the same general foreman is not suffi-
cient to establish the relation of fellow-servants as a matter of
law, and if the evidence as to their duties is conflicting, the ques-
tion whether they were fellow-servants is one of fact for the jury.

2. SAME—*car cleaner may rely on custom in movement of cars.*
A car cleaner engaged in his work in the yards of a street railway
company may rely upon a custom in the matter of moving cars
in the yards by which when live cars would be moved at night
the lights would be turned on and a bell rung and when dead cars
were pushed an employee with a lantern would ride on the front
end of the approaching car.

CARTWRIGHT, DUNN and COOKE, JJ., dissenting.

WRIT OF ERROR to the Appellate Court for the First
District;—heard in that court on appeal from the Superior
Court of Cook county; the Hon. JOSEPH B. DAVID, Judge,
presiding.

ROBERT J. SLATER, and CHARLES LEROY BROWN, (JOHN
R. GUILLIAMS, of counsel,) for plaintiff in error.

FRANCIS X. BUSCH, (ELMER M. LEESMAN, of counsel,)
for defendant in error.

Mr. JUSTICE STONE delivered the opinion of the court:

On appeal from the superior court of Cook county the
Appellate Court for the First District affirmed a judgment
in favor of the defendant in error, Jacob Kaminsky, and
against the plaintiff in error, the Chicago Railways Com-
pany, for the sum of $15,000 for an injury resulting in
the loss of his leg. A writ of *certiorari* has been allowed
to bring the record before this court for review.

It was stipulated on the trial as follows: The Lawndale car barn and the property connected with the barn is located approximately at Twenty-second street and Ogden avenue. The barn is on the south side of Twenty-second street, faces north and occupies a space east and west of approximately 200 feet. The barn extends south from Twenty-second street a distance of from 150 to 200 feet. In the rear of this barn, to the south, is a yard extending from 250 to 300 feet north and south. Connecting with the barn and on the west side of the yard is a fence that extends to the south end of the company's property. There is a fence across the south end of the company's property enclosing the entire yard except on the north. The barn occupies the entire north front of the property, with the exception of the space between the east side of the barn and the fence, from 20 to 30 feet wide. Coming off of the two main tracks on Twenty-second street are switches that lead into the different portions of the barn. Under each of the spaces connected by a track coming into the barn is a pit, called a "bay." There are six or seven of these bays. There is a main track coming into each one of these bays that extends from Twenty-second street through to the rear of the yard and rear of the barn, extending all the way from the entrance of the barn to the fence. Between the first main track to the east and the fence on the east side of the company's property, and immediately next to the fence, is a track known as the "sun-dry track." The track coming into the east bay and coming through to the fence will be referred to as "main track No. 1." The east wall of the barn separates main track No. 1 from the sun-dry track. There is a space of about 25 feet between the east wall of the barn and the east fence. Main track No. 1 is in the barn. The sun-dry track runs on the north to Twenty-second street. Connecting main track No. 1 and the sun-dry track is a cross-over or switch, beginning about two car-lengths south of the barn. North of that cross-

over there are two other tracks between the sun-dry track and the barn, and south of the cross-over there are no tracks between the sun-dry track and main track No. 1. At the point where the cross-over connecting the sun-dry track and main track No. 1 left main track No. 1 there was a track that left the west side of main track No. 1 and ran parallel with it, probably four feet from it, to the south end of the barn. Within the barn and under each one of the main tracks there was a pit for the purpose of permitting employees to work under the cars.

The defendant in error was injured on August 14, 1909. He was in the employ of the plaintiff in error at the time of the injury as a car cleaner at the Lawndale car barn and had been so employed for about three years. His work was cleaning the inside and outside of the cars after they had been run in at the close of their day's service. His hours of work were from seven o'clock in the evening until six o'clock the following morning. The barn and yard were used for the storage and care of street cars. From 150 to 200 cars were stored in the yard and barn every night. Early in the evening there were usually few cars in the yard but cars coming in gradually filled it, so that by midnight the tracks were ordinarily full of cars close together, and before morning the barn was usually filled also. The cars were first brought into the barn and stopped over the pits, where they were inspected, repaired when necessary and cleaned and stored for the night. If any disorder was reported by the car crew the report would be entered in the complaint-book in the barn. Every car was inspected each night for the purpose of testing its brakes and examining its controller. The work of inspecting and testing the brakes was done while the car was over the pit, as was also the repair work. As a general rule the cars coming early into the barn, after being inspected, were moved out into the yard. Cars were not stored in the barn until the yard tracks were filled. Most of the cars that

286 — 18

were quickly repaired were run out into the yard for the cleaners. The cleaners worked in the yard on these cars until about midnight or a little after, when their work on those cars would be finished. After midnight the cleaners went into the barn for the purpose of cleaning the cars that were not or could not be pushed out into the yard.

On the evening of the accident the defendant in error went to work at seven o'clock as usual, with his working partner, to clean cars in the yard. In about half an hour it began to rain, and the testimony shows that the water coming from under a viaduct became deep enough to flood the motors of some of the cars, because of which they would not operate and could not be lighted. Such cars are known as "dead" cars. In about half an hour after defendant in error went to his work in the yard, on account of the rain the car cleaners were ordered to close the windows. It was a general order. No cleaner was directed to go to any particular track on which cars were located or to any particular car. There were two cars on the sun-dry track and five on the main track next to it. The defendant in error closed the windows in the two cars on the sun-dry track while his partner closed the windows in the cars on the main track. After the defendant in error had closed the windows in the cars on the sun-dry track he walked across to the cars standing on the main track. These cars were standing close together, with a space of eighteen inches or two feet between the second and third cars from the south. Their fenders were touching. The doors on the east side of these cars were locked, so that no one could get on the platform from the east side. The defendant in error testified that he looked to the north as he came across to this string of cars and saw clear up to the barn; that he saw no cars moving; that he reached up to the hand-hold at the rear of the first car, pushed the doors but found them locked; that he stepped up on the fender and spoke to his partner, asking him if he was

through there, and took another step, when the cars came together, crushing his leg between them; that the cars were caused to come together by a train of three cars that were run out of the barn by one Stratsky, a car repairer, against the north one of the standing cars with such force as to cause all of them to come together. It is not denied that the door referred to was locked. The train of three cars testified to was made up of two dead cars, as above described, pushed by one live or lighted car, with no watchman or light on the dead end approaching the defendant in error. No whistle was sounded or other warning given. The three cars were operated by a repairman starting from within the barn and running out as indicated.

The evidence discloses that the plaintiff had worked for defendant as a car cleaner for about two and one-half years before he was injured and that Stratsky was a car repairer. Plaintiff was employed to scrub cars and to wash car windows, while Stratsky's work was said to be that of repairing defective brakes, and the evidence tends to prove that this class of repair work was all done in the pits.

The declaration was in five counts, the first of which charged that the defendant negligently and carelessly ran and operated a certain street car on certain tracks in the car barn and yard; the second, that the defendant negligently and carelessly ran the car upon the tracks without sounding any gong or giving any warning; the third, that the defendant negligently and carelessly with great force and violence ran a street car upon the tracks, which, by reason of its being so negligently and carelessly run, ran and struck with great force and violence against another car, and thereby the plaintiff was caught between two cars; the fourth and fifth, after describing the yard and tracks and alleging that the cars on the track near which plaintiff was working did not have the brakes set, charged that the defendant negligently and carelessly with great force and violence ran a certain car from the car barn along the track

in the yard toward the plaintiff without sounding any gong or giving any warning to the plaintiff.

The defendant moved for an instruction, at the close of plaintiff's evidence, to find it not guilty, and renewed the same at the close of all the evidence. These motions were denied. There appears to be no contention that the plaintiff in error was not guilty of negligence. Plaintiff in error contends that the superior court erred in not granting said motions to instruct, for the reasons, first, that the record shows that the negligence causing the injury was that of a fellow-servant; and second, that the defendant in error was guilty of contributory negligence. The injury was sustained in 1909, at a time when the fellow-servant rule existed as a defense in this State in cases such as this. Plaintiff in error contends that Stratsky, the employee who was operating the switching car and whose negligence in so doing caused the injury to defendant in error, was a fellow-servant with defendant in error. Stratsky was a car repairer. Both he and defendant in error were under the same general foreman, Schultz. Stratsky's work as repairman was done in the pits under the cars. These pits were in the barn. He, in common with other repairmen, moved the cars from over the pits when repairs were completed. Defendant in error was a cleaner, whose work was principally in the yard, though he at times cleaned cars standing over the pits while repairmen were working underneath. Plaintiff in error contends that therefore these men were each exposed to injury by the negligence of the other and were therefore fellow-servants. It is reasonably apparent from the record that at the times the cleaners were cleaning cars standing over the pits while certain repairs were being made by the repairmen working in the pits, the repairmen pursued their work without regard to the cleaners and the cleaners pursued their work the same as if no repairmen were working in the pits. The only association the cleaners as a class had with the repairmen as a class was

at the times when the cleaning and repairing were both done at the same time. The only association the individual cleaner had with the individual repairman would be on such occasion as the cleaner happened to be cleaning a car on which the repairman was working. Defendant's foreman, Schultz, testified that "each repairer had a special field of work on a car; one man worked on the brakes, one on the controller, one on the lights," etc.; that, "as an ordinary thing, the only time the car repairers and the car cleaners ever got close to each other was when they were in the barn. When I say they worked together on the same car I mean that sometimes when a car cleaner was scrubbing out a car or cleaning the windows some of these car repairers might be underneath looking at the brakes. That is as much as they worked together." The evidence tends to prove the car repairers never aided the cleaners in their work nor that the cleaners assisted the repairers.

The established rule regarding fellow-servants, as laid down in *Lyons* v. *Ryerson,* 242 Ill. 409, is as follows: "It has long been the settled law of this State that the servants of a common master, to be co-employees so as to exempt the master from liability on account of injuries sustained by one resulting from the negligence of the other, must be directly co-operating with each other in a particular business as distinct from indirect co-operation of the general business of the master, or that their usual duties must bring them into habitual association so that they may exercise a mutual influence upon each other promotive of proper caution.—*Hartley* v. *Chicago and Alton Railroad Co.* 197 Ill. 440; *Chicago and Eastern Illinois Railroad Co.* v. *White,* 209 id. 124; *Chicago and Alton Railroad Co.* v. *O'Brien,* 155 id. 630; *Chicago and Alton Railroad Co.* v. *Wise,* 206 id. 453."

The question whether servants of a common master are fellow-servants within the meaning of the law is usually a question of fact. If, however, the facts are not in dis-

pute and all reasonable men would readily agree as to the conclusions which should be drawn from the admitted facts, the question whether the relation of fellow-servant exists in a given case becomes a question of law. *Linquist* v. *Hodges,* 248 Ill. 491; *Lake Erie and Western Railroad Co.* v. *Middleton,* 142 id. 550; *Mobile and Ohio Railroad Co.* v. *Massey,* 152 id. 144; *Chicago and Alton Railroad Co.* v. *House,* 172 id. 601; *Louisville, Evansville and St. Louis Railroad Co.* v. *Hawthorn,* 147 id. 226; *Chicago and Alton Railroad Co.* v. *Swan,* 176 id. 424; *Chicago and Eastern Illinois Railroad Co.* v. *Driscoll,* 176 id. 330; *Norton Bros.* v. *Nadebok,* 190 id. 595.

In the case of *Linquist* v. *Hodges, supra,* a cement worker was injured by the negligence of a bricklayer working on the same building. The court there held that the first branch of the rule,—that is, "that they must be directly co-operating with each other in a particular business as distinguished from indirect co-operation in the general business of the master,"—was not applicable and said employees could not be held to be fellow-servants, as a matter of law, under that branch of the rule. It also held that whether they were fellow-servants under the second branch of the rule,—that is, whether or not "their usual duties must bring them into habitual association so that they may exercise a mutual influence upon each other promotive of proper caution,"—was a question of fact for a jury. So in the case of *Lyons* v. *Ryerson, supra,* (somewhat analogous to the case at bar,) where a common laborer was repairing a certain track in a machine shop, upon which track his master, through other servants, was loading a large amount of iron on a car used for that purpose by means of a traveling crane, and the craneman, by negligently managing the crane, permitted a chain to become tangled in the car in such a manner as to upset it and its contents upon the plaintiff's foot, the court, in discussing the rule, said: "There is evidence tending to show that appellee was

co-operating with others in the particular business of the master,—that is, in repairing the tracks and loading this angle-iron. Appellee's testimony is to the contrary, denying that he had anything to do with the loading of the iron and asserting that the other men were not assisting him in repairing the tracks. On this state of the record it cannot be said, as a matter of law, that the evidence is of such a nature that all reasonable minds would reach the same conclusion as to whether the appellee was a fellow-servant under the first branch of this rule. Does the fact that the evidence shows, without contradiction, that appellee was working near these men on the date in question make them fellow-servants, as a matter of law, under the second branch of the rule? We are inclined to think, on the facts as heretofore stated, that this court cannot so hold. (*Gathman* v. *City of Chicago,* 236 Ill. 9; *National Enameling Co.* v. *McCorkle,* 219 id. 557.) Under both branches of the rule, therefore, the question was one of fact to be submitted to the jury."

In this case it cannot be said, as a matter of law, that defendant in error and Stratsky were directly co-operating in a particular business as distinguished from an indirect co-operation in the general business of the master. The evidence tends otherwise. Whether or not they were fellow-servants under the second branch of the rule as a matter of law, depends upon whether or not, admitting the testimony of defendant in error to be true, it is nevertheless insufficient to take him out of the rule. We think the court cannot, on a view of the evidence, so hold. The fact that these men occasionally worked near each other and were under the same general foreman is not sufficient to establish, as a matter of law, that they were fellow-servants. The evidence was conflicting concerning some of the duties of these men. It was properly a matter of fact to be left to the jury, and the court did not err in refusing to grant plaintiff in error's motion to instruct on that ground.

Plaintiff in error further contends that the said motion should have been allowed for the reason that defendant in error was guilty of contributory negligence. Defendant in error testified that he looked in the direction from which cars would come onto the track containing the cars which injured him; that he saw no cars moving; that he heard no whistle or warning of any character, and that he attempted to cross between two of the cars in order to proceed with his work on the other side. The weight of the testimony shows that there was a custom, at least, in moving live cars,—*i. e.,* cars whose motors would operate and in which lights could be turned on,—to sound a whistle or ring a bell when approaching other cars in the yards, and, when moving dead cars by pushing the same with a live car, to have a watchman with a lantern on the dead end approaching other cars in the yard. Defendant in error had a right to rely on this custom. The evidence shows that the cars that were pushed in had no light on them nor was there a watchman to give warning. No bell or whistle was sounded or blown. Clearly, with this evidence in the record we cannot say, as a matter of law, that defendant in error was guilty of contributory negligence. That question was properly left to the jury. The superior court did not err in refusing the motion of plaintiff in error to instruct the jury for it.

Plaintiff in error complains of the refusal of the trial court to give certain instructions offered by it and of the giving of certain instructions offered by the defendant in error. We have examined the instructions complained of, together with the entire series in the case, and find that the jury were fully and fairly instructed.

The judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*

CARTWRIGHT, DUNN and COOKE, JJ., dissenting.