[1] Reported in 208 N.W. 18.
By certiorari a decision of the Industrial Commission denying a claim made under the Workmen's Compensation Act is presented for review.
The facts are these: The claimant and appellant is the widow of Max N. Eichholz, who on November 30, 1923, was drowned in Lake Vermilion while attending to some traps he had set at various points along its shore. He broke through the ice some 20 or 30 feet from shore, near the boundary line of a 60-acre tract owned by the respondent E. May Shaft, the wife of the other respondent. Mr. Shaft is in the manufacturing business at Faribault, this state, where the family resides. The tract above mentioned at Lake Vermilion was acquired for a summer home. While the title is in Mrs. Shaft, Mr. Shaft has much to do with improving, financing and managing the home. The claim is that the money needed and expended for buildings has been advanced by Mr. Shaft as a loan to his wife. At any rate, this tract is used exclusively as a summer home for the family. There are several buildings, one the owner's cabin, costing from $5,000 to $6,000, two barns, store house, ice house, boat house and a caretaker's four-room cottage, all built of logs. No building is designed or used for renting purposes. The land is very rocky and unfit for cultivation, except small patches selected for flower and vegetable gardens. It was deemed desirable to have a caretaker of the place, who would live upon it the year round.
September 15, 1922, Mrs. Shaft made a written contract with Max N. Eichholz as caretaker, agreeing to pay him $50 per month, and the use of the caretaker's cabin, dead and down timber for fuel purposes, and in consideration thereof Eichholz and his family agreed to render these services: To keep the land, buildings, tools and premises clean and in good appearance; to remove only such trees and shrubs as the owner directs; to supply the owner with dry wood cut and piled for grate and cook stove; to plant and till garden spots with such fruits and vegetables as may be grown in that locality and supply the owner each morning with freshly gathered *Page 341 
fruits and vegetables; to keep at his own expense three cows and deliver to the owner each morning and evening fresh milk and cream to the extent of one-half obtained from the cows; to keep the cows by fence away from the cabins, spring and beach; to keep and care for one dog and one goat for the owner; to plant and care for flowers and shrubs and potted plants around and in the owner's cabin; to put on and take off screens and keep floors and furnishings of owner's cabin clean; to keep boats, boat house and dock clean and do such painting as may be suggested by the owner; to put up sufficient ice and deliver to the owner as needed; to keep beach and spring clean; to clean and "steak" such fish as the owner may have on hand, and assist the owner in any work for the beautifying and upkeeping of the property; to keep an accurate account of all vegetables, milk and cream sold and to share alike with the owner the proceeds, the owner to decide what shall be sold; to protect to the best of his ability all the property of the owner including furnishings, bedding supplies and tools and not to vacate the property overnight, without the owner's consent; and to quietly vacate if the agreement is terminated by notice.
The evidence shows that Mr. Shaft sent three bear traps, with which Mr. Eichholz hoped to catch bears so that the former might have a fur rug for the cabin, but the traps were too small and attempts to trap either bear or wolf were vain. Mr. Eichholz owned a number of small traps, and it appears that he trapped weasels and skunks. Seven or more weasel skins were sent to Mrs. Shaft, out of which a collarette was made. There is some claim that the caretaker was directed to kill off destructive animals, but the showing is not persuasive that Mr. Eichholz in setting his traps, on or away from the premises of Mrs. Shaft, was in the line of his duty as the servant of either herself or husband. The inference is rather that the skins sent were a present and that, if Mr. Eichholz had any time to spare from the duties he had expressly undertaken to perform in the written contract or specially been requested to do by Mr. Shaft, he was to use it for his personal profit or pleasure. He had no certain hours or days during which his time must be given to the service of the Shafts. *Page 342 
It may be difficult to classify the deceased in his relations to the Shafts and his work. In certain aspects he enjoyed the privileges of a tenant, and did what might be called farm work. Then again he had menial duties to do, such as generally fall to the lot of domestic servants. The findings of the referee, approved by the Industrial Commission, were: (1) That this lake property was maintained by the Shafts as a summer home, and not for profit, and was not in any way connected with the usual business of Mr. Shaft, a shoe manufacturer; and (2) that the deceased was a domestic servant of respondents. The evidence compels a finding such as the first. As to the second there may be doubt. While it is undisputed that the employment of the deceased was confined to the care of that home and ministering to the needs and comforts of the Shaft family in that home, all his duties may not come within what in law or general understanding are termed "domestic." But, even conceding it to be wrong, the decision of the commission nevertheless is right.
The object of the Workmen's Compensation Act must be kept in mind in construing and applying its provisions. It was to saddle the industries with the loss that resulted to the employes therein from accidental injuries received in the work. In California the compensation act was "held constitutional only because it imposes a charge, not upon the individual employer, but upon the branch of industry in which he is engaged, and gives the employer opportunity of protecting himself by proper insurance." Miller Lux Inc. v. Industrial A.C. 179 Cal. 764,178 P. 960, 7 A.L.R. 1291; Western Ind. Co. v. Pillsbury,170 Cal. 686, 151 P. 398. Industries are carried on for profit, and it was felt that they should and could bear the loss from accidental injuries to the workmen engaged therein as part of their expenses; but those engaged in farming were not deemed well able to bear the burden, hence farm laborers were excluded, and a farmer, until lately even if he desired, could not come in under the act; and this is significant of a purpose also to except from its operation the accidental injuries to employes engaged in maintaining the home. This conclusion is strengthened *Page 343 
because of the exclusion from the operation of the act of "persons whose employment at the time of the injury is casual, and not in the usual course of the trade, business, profession or occupation of his employer." G.S. 1923, § 4268.
The upkeep and care of a home for one's self and family are not in the category of a trade, business, profession or occupation, as generally understood. A home is not established and maintained in the expectation of pecuniary gain. Such a venture is solely an expense. It therefore did not come within the original purpose of the act to include the home as an industry to be burdened with the accidental injuries to servants therein engaged. There is no reason why, if the housemaid is excluded, the charwoman, who might be engaged to come at stated times for a year to work in the home, but who does not live in the family, should be included in the act. Maintaining a home, whether in an apartment or in spacious grounds with separate quarters thereon for the servants employed in administering to the comforts of the family, does not come within the definition of the Workmen's Compensation Act, however liberally construed, as being a part of the trade, business, profession or occupation of the employer. Nor is it an industry.
We have held that, however casual the employment, if it be in the usual course of an employer's business, the employee comes within the law. State ex rel. City of Northfield v. District Court, 131 Minn. 352, 155 N.W. 103, Ann. Cas. 1917D, 866; State ex rel. Lennon v. District Court, 138 Minn. 103, 164 N.W. 366. Also that a person may be engaged in more than one enterprise to gain a living, and an employee in any one is protected. Benoy v. Torkelson, 161 Minn. 223, 201 N.W. 312. Persons engage in a trade, business, profession or occupation for profit, or as a means to gain a livelihood, but not so in establishing and maintaining a home; and therefore the employment as caretaker, within the definition above quoted, is not within the act.
There is no apparent reason for placing the maid, who sleeps in the employer's home and does the work inside the building, in a different position to this law than the caretaker of the outside of *Page 344 
the building who sleeps in a separate building on the premises, and perhaps operates the heating plant for the home which may also be apart therefrom. They are both servants whose services are entirely devoted to the upkeep of the home and the comfort of the members of the family. Nor can any distinction be made between the temporary summer home and the town home of a family. The keeping of this modest acreage of mostly rock on the shores of Vermilion as a summer home cannot, without doing violence to the language, be construed as a business or occupation, or a side line thereof. It is not to be compared to the 6,000-acre ranch, where the employe injured was a member of a crew operating a portable sawmill for cutting "down" timber, and was allowed compensation, Pierce v. Industrial Com. 179 Wis. 189,190 N.W. 80.
Nor does the instant case come within that of Klein v. McCleary, 154 Minn. 498, 192 N.W. 106, where the injured employe recovered because the employer was held to be engaged in operating a summer resort for profit, even though a part of the employe's work was farm labor upon the premises connected with the resort. Nor is it a case like O'Rourke v. Percy Vittum Co. supra, page 251, where a steady employe of the company in its ordinary business was directed by its manager to do some service outside its business, it not appearing that the work was not the company's so far as the employe was concerned.
It might be urged that Mrs. Shaft's sole occupation was that of a housewife, conducting the home, and therefore the deceased was employed by her in her usual occupation. But we think a housewife is not an occupation within the meaning of the compensation act, since that work pertains exclusively to the management of the home. Furthermore, in the maintenance of the home the husband and wife are one. The one acts for the other. No matter who is the legal owner of the home, the running thereof is not an industry nor a business, trade, profession or occupation within the purview of the Workmen's Compensation Act. And we hold that employes who are employed exclusively in the care of the family home and in serving the members of the family are not within the act, and were not intended to come within it. *Page 345 
The workmen's compensation acts of the various states are not alike. That of Pennsylvania is not the same as ours, but the case of Marsh v. Groner, 258 Pa. St. 473, 102 A. 127, L.R.A. 1918F, 213, reaches the conclusion that a person employed by a housewife to aid in enlarging the home by an extensive addition thereto was not employed in the "regular course of the business of the employer."
The above considerations lead to an affirmance and it becomes unnecessary to determine whether the finding is strictly accurate that the deceased was a domestic servant. Not much aid can be had from the Texas decisions cited, involving the peculiar wording of a criminal statute, viz.: Wakefield v. State, 41 Tex. 556; Richardson v. State, 43 Tex. 456; Waterhouse v. State,21 Tex. App. 663[21 Tex.Crim. 663], 2 S.W. 889; nor from Hall v. Philadelphia Co. 72 W. Va. 573, 78 S.E. 755, dealing with a contract wherein it became necessary to define the meaning of the word "domestic" and "domestic use;" nor from Toole Furniture Co. v. Ellis,5 Ga. App. 271, 63 S.E. 55, involving the construction of a statute making the master liable for the torts of the servant. In the same class may be placed In re Howard (C.C.) 63 F. 263, touching the question whether an undercoachman was employed "strictly as a personal or domestic servant" within the purview of the act of Congress prohibiting immigrants to enter who are under contract to labor for others.
There was a motion to dismiss the writ on the ground that service was not made on respondents within 30 days or at all. The compensation procedure is that the writ of certiorari must be obtained and served on the industrial commission within 30 days from the service of the notice of the decisions upon the parties unless the time has been enlarged for cause. G.S. 1923, § 4320. It does not in terms prescribe that the opposing party shall be served with a copy of the writ. But the general statute relating to the writ of certiorari provides that it must be served upon the adverse party within the 60-day period within which it must be obtained after notice of the decision. G.S. 1923, § 9770. In this case after the 30-day period, but within the 60-day period, an informal written notice was given the adverse party. We think the conduct of *Page 346 
respondents' counsel was such thereafter as to now, after relator has gone to great expense to present the matter, preclude a dismissal.
The decision of the Industrial Commission is affirmed.
STONE, J., took no part.