**Ida Lamar, Appellee, v. William M. Collins et al., Defendants. William M. Collins, Appellant.**

**Gen. No. 33,007.**

240

Opinion filed March 26, 1929.

D'Ancona & Pflaum and Edward W. Rawlins, for appellant.

Urban A. Lavery and Leesman, Roemer & Schnell, for appellee.

Mr. Justice Scanlan delivered the opinion of the court.

In the superior court of Cook county, Ida Lamar, plaintiff, sued William M. Collins and Northwestern Lumber Company, a corporation, defendants, in an action in case. There was a trial before the court with a jury and a verdict was returned finding the defendant Collins guilty and assessing the plaintiff's damages at the sum of $35,000. The defendant Northwestern Lumber Company was found not guilty. From a judgment entered on the verdict against him the defendant Collins appealed.

The plaintiff was a maid at the summer home of the defendant Collins, at Lake Forest, Illinois. She was injured on August 20, 1926, while riding in an automobile belonging to Collins and driven by his chauffeur, while she was being taken from the station at Lake Forest to the said home. At a certain point on the Waukegan road the automobile struck the rear end of a lumber "wagon" of the defendant Northwestern Lumber Company that was standing on the side of the road.

The first contention of the defendant Collins is that the court erred in refusing to instruct the jury, at the close of all the evidence, to find the defendant not guilty, because "the undisputed evidence shows that at the time of the happening of the accident the plain-

tiff and the chauffeur, Snyder, who was driving the automobile at the time of the said accident, were fellow-servants.''

The plaintiff was a second maid in the home of the defendant. Her regular duties were to wait on the table and to take care of the front part of the house. She also did part of the cooking when the cook had her day off or was on a vacation, or the defendant was without a cook. The plaintiff's home was in Chicago, and it appears that when she went to work with the defendant, it was agreed that the defendant would bring her back and forth from the station, and pay her transportation to and from Chicago. Sometimes the son of the defendant took the plaintiff to and from the station. Snyder, in charge of the automobile at the time of the accident, was a chauffeur and mechanic, and had then been in the employ of the defendant about three or four weeks. He thus states his duties: ''I took care of the cars, did the driving for Mr. and Mrs. Collins, and I took the servants and other employes, by order of Mrs. or Mr. Collins, to the depots *on their off days*. I never took any of the maids to picture shows. I went to the store, picked the groceries up and brought them back into the kitchen.'' He further testified: ''I got my meals in the main house, in the kitchen with the rest of the servants; that included Ida Lamar.'' At the time of the accident the plaintiff was returning from her home in Chicago to the home of the defendant at Lake Forest, and she was not then on duty. She had never driven an automobile and knew nothing about the operation of one. She had ridden in the automobile, when Snyder was driving it, ''about three times.''

In support of his present contention, the defendant has cited certain decisions from jurisdictions that follow the doctrine laid down by Chief Justice Parker in *Farwell v. Boston & Worcester R. Corp.*, 4 Metc.

(Mass.) 49. That case has been declared to be the basis of the existing common law of England and America on the "Fellow Servant Rule." (12 Amer. & Eng. Encyc. of Law (2d Ed.) 898; *Chicago & N. W. R. Co. v. Moranda,* 93 Ill. 302, 309.) The said doctrine is that a master is not liable for injuries to his servant caused by the negligence of a fellow servant engaged in the same general business, where the master has furnished proper means for carrying on the work, and has used due care in the selection of servants. In *Chicago & N. W. R. Co. v. Moranda, supra,* our Supreme Court, in a celebrated opinion, refused to follow the Massachusetts doctrine and held that in order to constitute servants of the same master "fellow servants" within the rule of *respondeat superior,* it is not enough that they were engaged in doing parts of some work or in the promotion of some enterprise carried on by the master, not requiring co-operation, nor bringing the servants together, or into such personal relations that they could have exercised an influence one upon the other promotive of proper caution in respect of their mutual safety,—but it is essential either that they were actually co-operating at the time of the injury in the particular business in hand, or that their usual duties should bring them into habitual consociation, so that such proper caution would be likely to result. In a late case (*Kaminsky v. Chicago Rys. Co.,* 286 Ill. 271, 277) the court thus states the rule: "The established rule regarding fellow-servants, as laid down in *Lyons v. Ryerson,* 242 Ill. 409, is as follows: 'It has long been the settled law of this State that the servants of a common master, to be co-employees so as to exempt the master from liability on account of injuries sustained by one resulting from the negligence of the other, must be directly co-operating with each other in a particular business as distinct from indirect co-operation of the general business

of the master, or that their usual duties must bring them into habitual association so that they may exercise a mutual influence upon each other promotive of proper caution.—*Hartley v. Chicago and Alton Railroad Co.,* 197 Ill. 440; *Chicago and Eastern Illinois Railroad Co. v. White,* 209 id. 124; *Chicago and Alton Railroad Co. v. O'Brien,* 155 id. 630; *Chicago and Alton Railroad Co. v. Wise,* 206 id. 453.' " (See also *Thompson v. Northern Hotel Co.,* 256 Ill. 77, 84.) It is clear that the plaintiff and the chauffeur, Snyder, were not fellow servants under the first branch of the rule, as they were not co-operating with each other in any particular work at the time of the injury. The real question involved in the present contention is: Were the plaintiff and Snyder fellow servants under the second branch of the rule? "The question whether the servants of a common master are fellow-servants is usually a question of fact, and never becomes a question of law unless the facts proven show such relation so clearly to exist that all reasonable minds will readily agree that such is the relation of the servants of the common master to each other. (*Duffy v. Kivilin,* 195 Ill. 630; *Spring Valley Coal Co. v. Patting,* 210 id. 342; *Missouri Malleable Iron Co. v. Dillon,* 206 id. 145.)" (*Gathman v. City of Chicago,* 236 Ill. 9, 15. See also *Aldrich v. Illinois Cent. R. Co.,* 241 Ill. 402, 406–8; *Lyons v. Ryerson & Son, supra,* 242 Ill. 409, 414.) If there is reasonable doubt on the question it should go to the jury. (*Linquist v. Hodges,* 248 Ill. 491, 505.) After a careful consideration of the present contention, we are satisfied that the trial court did not err in refusing to hold, as a matter of law, that the plaintiff and the said chauffeur were fellow servants, and that he ruled correctly in submitting the question to the jury. The jury found, as a matter of fact, that they were not fellow servants and the defendant con-

tends that "the verdict of the jury finding as it did that the plaintiff and the said chauffeur were not fellow-servants is clearly against the manifest weight of the evidence." We find no merit in this contention. The trial court approved the finding of the jury and we concur in that action.

The defendant contends that "the court erred in striking out and excluding defendant Collins' exhibits 1, 2, 3, 4, 5, 6, 7, 8, 9, and 10, . . . ; and it also erred in striking out and excluding the testimony of the witness Ballantyne, and in striking out a portion of the testimony of the defendant." The defendant argues that the plaintiff was not entitled to recover for the reason that at the time of the accident she and the defendant were working ,under and bound by the provisions of the Workmen's Compensation Act of this State and that the evidence excluded tended to prove that the plaintiff and defendant were bound by the said act.

Section 5 of the act, Cahill's St. ch. 48, ¶ 205, so far as it is applicable to the instant contention, reads as follows: "The term 'employee' as used in this Act, shall be construed to mean: . . . Every person in the service of another under any contract of hire, express or implied, oral or written, . . . including aliens, and minors who are legally permitted to work under the laws of the State, who, for the purpose of this Act, shall be considered the same and have the same power to contract, receive payments and give quittances therefor, as adult employees, *but not including any person who is not engaged in the usual course of the trade, business, profession or occupation of his employer; . . .*" Was the plaintiff an employee to whom the act applied? The defendant testified: "I am in the restaurant business at 71 West Randolph street, Philip Henrici Company. I have about 350 em-

ployes in my business there. That includes different types of employes. The F. Edson White home was my home during the summer. . . . The Philip Henrici Company is a corporation, of which I am the president." Under the plain language of the statute, it would seem clear that the plaintiff was not an employee to whom the act applied. In *Eichholz v. Shaft,* 166 Minn. 339, the court stated that the object of a Workmen's Compensation Act was "to saddle the industries with the loss that resulted to the employees therein from accidental injuries received in the work. . . . Industries are carried on for profit, and it was felt that they should and could bear the loss from accidental injuries to the workmen engaged therein as part of their expenses." In *Grand Trunk Western Ry. Co. v. Industrial Commission,* 291 Ill. 167, 174, in answer to the contention that the Compensation Act created liability without fault, the court said: "Such a loss stands to the employee as his capital in trade. It is a loss arising out of the business in which he is employed, and, however it may be charged up, is an expense of the operation just as truly as the cost of repairing broken machinery or any other expense that ordinarily is paid by the employer. On grounds of natural justice the business should bear this charge." In *Berry Co. v. Industrial Commission (Raymond Brooks,* defendant in error), 318 Ill. 312, Berry Company was engaged in the business of subdividing and selling real estate as agent for owners, and while preparing a certain farm for subdivision it was found expedient to tear down an old barn situated on the land. Brooks was hired to work on the barn, and in the course of his employment was injured, and he applied to the Industrial Commission for the adjustment of his claim under the Compensation Act. Berry Com-

pany contended that Brooks, at the time of the accident, was not engaged in the usual course of the trade, business, profession or occupation of the company and was therefore not an employee within the meaning of the act. The Supreme Court sustained this contention. In *Johnson v. Choate,* 284 Ill. 214, 220, it is said: "The employer must be engaged in the occupation, enterprise or business, and therefore the building maintaining or repairing of a dwelling house, which is neither the occupation, enterprise or business of the owner, does not bring him within the act, nor does the building of a shed or other similar structure by or for a farmer come within the terms of the statute or the legislative intention. (*Uphoff v. Industrial Board,* 271 Ill. 312.)" "The upkeep and care of a home for one's self and family are not in the category of a trade, business, profession or occupation, as generally understood. A home is not established and maintained in the expectation of pecuniary gain. Such a venture is solely an expense. It therefore did not come within the original purpose of the act to include the home as an industry to be burdened with the accidental injuries to servants therein engaged. There is no reason why, if the housemaid is excluded, the charwoman, who might be engaged to come at stated times for a year to work in the home, but who does not live in the family, should be included in the act. Maintaining a home, whether in an apartment or in spacious grounds with separate quarters thereon for the servants employed in administering to the comforts of the family, does not come within the definition of the Workmen's Compensation Act, however liberally construed, as being a part of the trade, business, profession or occupation of the employer. Nor is it an industry." (*Eichholz v. Shaft, supra.*) In 1 Schneider's Workmen's Compensation Law (1922), pp. 65, 147, it is stated that domestic servants are excepted, either expressly or by implica-

tion, from all of the American Compensation Acts save that of New Jersey. Under the Workmen's Compensation Law of New York, as amended: "Any employer not carrying on one of the employments enumerated in this section, or who carrying on one of such employments has in his employ an employee not included within the term 'employee' as defined by section three of this chapter, and the employees of any such employer may, by their joint election, elect to become subject to the provisions of" the act. (See *Caldana v. Buezenburg*, 200 N. Y. Supp. 468, 469.) This case, cited by the defendant, was governed by the above amendment and has no bearing upon the instant contention, as our act contains no such provision. After a careful consideration of the present contention, we find no merit in it. The plaintiff did not seek in any way to come under the act, and she argues that "the plaintiff was an employee who could not be brought under the act by the election of her employer. But, even if she had been an employee who could, nevertheless, in this case the employer elected to bring only the chauffeur under the act. And, furthermore, even if she had been under the act, the injury she sustained was not sustained in the course of her employment." In the view that we have taken of the instant contention it is not necessary for us to pass upon these points.

The defendant next contends that the court erred in instructing the jury that the plaintiff, at the time and place in question, was not under or subject to the terms of the Compensation Act. Our ruling as to the last contention, if it be correct, disposes of the instant one.

The defendant contends that the verdict "in regard to the question of defendant's alleged negligence" is

against the manifest weight of the evidence. This contention is without the slightest merit. The defendant concedes that during the ride from Lake Forest to the place of the accident "a very severe storm was in progress. The rain was pouring down, and the thunder and lightning was frequent, loud and prolonged." A witness testified that it rained so hard that his motor started missing and he was compelled to pull off on the side of the road and stop. The defendant's chauffeur testified that "it was raining, a real bad storm, could not see nothing. . . . I couldn't see either side and I couldn't see over 50 feet ahead of me. . . . It did not occur to me to stop and wait until I could see. I had orders." As to the speed of the defendant's auto: The plaintiff testified that it was driven very fast and that because of that fact and the severity of the storm she twice requested the chauffeur not to go so fast—to go slower, and that she said to him: "If you won't go slower, stop the car and let me out." One of the witnesses testified that "the noise of the automobile coming was just a continuous roar, . . . sounded like an aeroplane to me." Before the collision the driver of the lumber "wagon" had stopped its machine, on account of the storm, on the right-hand side of the road, with the east or right-hand wheels of the "wagon" off the concrete portion of the road. When the defendant's car struck the trailer of the lumber "wagon" it sounded like "an awful crash." The lumber "wagon" had six wheels and consisted of a truck with four wheels and a trailer with two wheels. It had on it 2,500 to 2,800 square feet of lumber 25 feet long, fastened together and to the "wagon" by a steel chain, the links of which were about an inch in thickness. At the time of the accident the driver of the lumber "wagon" was in a farmhouse near by. After the collision it was found that the truck had been moved a distance of 25 feet and into a ditch on the side of the road. A part

of it had been pushed into a fence and its front end was tipped up on a mail box. The steel chain was broken into pieces and "the lumber was all over the road." Two pieces of lumber went through the cowl of the defendant's car and bent the back of the front seat, and the plaintiff, who sat in the rear seat, was found "tangled up" in the lumber. She was "pinned in there" by the lumber and was unconscious. Defendant's car, a heavy Rolls Royce automobile "was wrecked." After striking the "wagon" it traveled at least 60 or 75 feet farther north and came to a stop against a tree on the left-hand, or opposite, side of the road. The chauffeur testified: "After hitting the truck I don't know just how far I went before my car came to a stop; I steered it into the tree on the left-hand side of the road. I don't know how far beyond the scene of the accident that was." "After I hit it I turned off and went up into a tree. . . . I tried to miss the truck and I turned my car, but I didn't turn short enough." "I had good brakes, . . . they were in satisfactory working order at the time." The chauffeur testified that all of the wheels of the lumber "wagon" were on the concrete; that he did not hear the plaintiff say anything about the way he was driving; that when he saw the truck he was going between 20 and 25 miles an hour; that he could then have stopped the car before he got to the truck by stepping on the "service brakes alone," "if I had seen it really." We are satisfied, after a consideration of the evidence, that the testimony of the chauffeur, on any disputed question of fact, is entitled to little, if any, weight. The facts and circumstances of this case clearly show that the chauffeur was guilty of negligence of the grossest kind and that the accident was the natural consequence of his reckless driving.

The defendant next contends that the court erred in permitting the plaintiff to testify as to certain state-

ments she made to the chauffeur before the happening of the accident. Plaintiff testified that she said to the chauffeur: "Please don't go so fast"; and again: "Go slower," and again: "Please don't go so fast. If you don't, please stop the car and let me get out. I would rather walk." The objection made to these statements was that they were self-serving and not a part of the *res gestae,* and not made in the presence of the defendant. It was necessary for the plaintiff to prove that at the time of the accident and just prior thereto she was in the exercise of ordinary care for her own safety. In *Pienta v. Chicago City R. Co.,* 284 Ill. 246, 259, it was held that it was the duty of a passenger of a vehicle, where he has an opportunity to learn of approaching danger and avoid it, to warn the driver of the vehicle of such danger, as he has no right, because some one else is driving the vehicle, to omit reasonable and prudent efforts on his part to avoid the danger. In *Opp v. Pryor,* 294 Ill. 538, 547, it was held that it was the duty of the plaintiff, who was riding in an automobile, "to observe and avoid danger, if practicable, and to warn the driver." (See also *Grifenhan v. Chicago Rys. Co.,* 299 Ill. 590, 595.) In the recent case of *Brown v. Yellow Cab Co.,* 251 Ill. App. 621, decided by this division of the court, we held that it was proper to allow a passenger in an automobile to testify that she cautioned the driver in reference to the speed. Under the circumstances of the instant case, had the plaintiff failed to caution the chauffeur, the defendant might then have argued with some force that she was not in the exercise of due care for her own safety. There is no merit in the present contention.

The defendant next contends that "the amount of the verdict and judgment is excessive." The defendant concedes that "the injuries to the plaintiff were quite severe and that part of the injuries are probably permanent." The plaintiff suffered a compound, comminuted fracture of the cheek bone, running back

across the occipital. The parts were separated three-quarters of an inch, so that "you could put your fingers down into the sinus of the bone." She had a complete fracture of the lower jawbone, which dropped down. A dentist was required to wire the teeth together to keep the parts of the broken jaw in place. It was necessary to pull a tooth before the fragments could be held together. She had a complete fracture of the middle third of the humerus of the right arm. This fracture refused to knit and it was found necessary to call a specialist in bone surgery, who performed two or three operations. First he attempted, with ivory pegs, to obtain a union, but failed. The arm was then put in a plaster cast and kept in it for five months, when it was found that there had been no bone formation. A piece of bone was then taken from the plaintiff's leg and implanted into the ends of the fracture and her arm was "put into a metallic splint, a triangular splint with the arm held at about 45 degrees from the body, and the whole arm and shoulder bound in so there couldn't be any possible movement." This splint was kept on for about four months, during which time other efforts were made to produce a bony union. It was then found that there was no union. This condition is permanent, and the plaintiff, whose occupation requires the use of both arms, has what is sometimes called a "flail arm." The plaintiff suffered other injuries than those we have mentioned, but we do not deem it necessary to refer to them. As the result of the injuries she underwent very great pain and suffering over a long period of time. The expenses incident to the treatment of her injuries were heavy. We are satisfied that the amount of the verdict is not excessive.

The defendant next contends that "the Court erred in overruling the motion of the defendant to withdraw a juror and call a new panel, because of conduct on the part of the plaintiff which was prejudicial to defend-

ant.'' At one point during the direct examination of the plaintiff the record shows that ''the witness wept,'' and that the court stated to the witness: ''If you can't control yourself I will have to suspend.'' The defendant made no objection to this incident nor any reference to it. Later in the said examination the following occurred: ''Mr. Rawlins (Attorney for the defendant): She is weeping again and I don't think that is proper. The Court: The jurors may have a short recess. (Thereupon the jurors left the room, and the following occurred out of their presence and hearing): Mr. Rawlins: I move that because of this a juror be withdrawn and the case continued. Let the record show that on two occasions the witness wept on the stand. My motion was to withdraw a juror because of that and call a new panel, which is denied—that a juror be withdrawn and a new panel called. Mr. Roemer (Counsel for the plaintiff): I deny two, but she had tears in her eyes, but she was not weeping. The Court: (To Mr. Roemer) You may make your statement, and (to Mr. Rawlins) you may make yours. Mr. Rawlins: I move at this time that because of this a juror be withdrawn and a new panel called. The Court: Motion denied.'' The record is silent, save as to the statements of the counsel, as to the actual conduct of the plaintiff at that time. We may assume, however, from the admission of the counsel for the plaintiff, that at the time of the objection the plaintiff had tears in her eyes. The counsel for the defendant presumed to dictate what the record should show and he further presumed—and apparently desired—to have it show a denial of his motion, when the court had not passed upon it. When the court manifested a willingness to go into the question as to the actual conduct of the plaintiff, counsel for the defendant closed the incident with a formal motion. It is evident that he was not anxious to have a juror withdrawn. We find nothing in the record to indicate that the conduct of the plaintiff was

intentional and for an improper motive, and it is not surprising that she, considering the terrible injuries she sustained, and the suffering she endured as a result of the same, should have shown emotion as she narrated incidents of the ride. In this enlightened country and under our system of universal education, jurors must be presumed to possess reason and judgment. The trial court saw the plaintiff and was in the best position to determine whether the act complained of called for the withdrawal of a juror. We are satisfied that the damages awarded are not excessive; and if we are correct in holding that the plaintiff was not a fellow servant of the chauffeur and was not bound by the Compensation Act, it follows that the verdict is a just one and that therefore the said incident complained of could not have prejudiced the rights of the defendant.

We have now considered all of the contentions raised by the defendant in his brief. In our opinion he has had a fair and impartial trial. The judgment of the superior court of Cook county is a just one and it should be and it is affirmed.

*Affirmed.*

GRIDLEY, P. J., and BARNES, J., concur.