THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
*v.* WALTER L. WILCOX, Appellant.

Crimes — murder — trial — evidence — trial of indictment charging defendant with murder in second degree — dying declarations — material error to reject testimony tending to show mental condition of dying man at time of making statement — cross-examination of witness who had testified to alleged confession — material error to refuse to permit defendant's counsel to question witness as to different statements made by him before grand jury as shown by minutes.

1. Upon trial of an indictment charging defendant with the crime of murder in the second degree, where the case against him depended in part upon the dying declarations of the man killed, it was material error for the trial court to reject testimony tending to show the latter's mental condition, its weakness, uncertainty and confusion, at the time of making the alleged statement.

2. It was also error to sustain objections to questions asked by defendant's counsel, on cross-examination of a witness who had testified to an alleged confession, as to different statements made by him on the same subject in his testimony before the grand jury, as shown by its minutes. The defendant was entitled to prove that the witness had sworn differently before the grand jury, and, where the case rests almost entirely upon alleged confessions, the error was not cured by permitting the witness to state that he did not recollect having made a different statement. The defendant was entitled to prod his memory as to his testimony before the grand jury and to make him admit, if possible, that he had made such a statement.

*People* v. *Wilcox*, 220 App. Div. 732, reversed.

(Argued June 6, 1927; decided June 14, 1927.)

APPEAL, by permission, from a judgment of the Appellate Division of the Supreme Court in the second judicial department, entered April 14, 1927, which affirmed a judgment of the Orange County Court rendered upon a verdict convicting the defendant of the crime of murder in the second degree.

*Abram F. Servin* for appellant. The statement of Hadden was not admissible as a dying declaration; but, in any event, defendant was prejudiced by being precluded from proving the mental condition of the declarant and by the charge of the court regarding its weight as evidence. (*People* v. *Sarzano,* 212 N. Y. 231; *Donnelly* v. *State,* 26 N. J. L. 463; *People* v. *Shaw,* 63 N. Y. 36; *People* v. *Smith,* 172 N. Y. 210; *People* v. *Falletto,* 202 N. Y. 494; *House* v. *State,* 94 Miss. 107.) The statement of Wilcox to the State trooper, Grimes, and those to the policeman, McCoach, could not be regarded as confessions; they were, however, treated as such, and the defendant was further prejudiced by the refusal of the court to allow contradictory statements of McCoach to be shown. (*New York Guaranty & Indemnity Co.* v. *Gleason,* 78 N. Y. 503.)

*Elmer H. Lemon, District Attorney (Henry Kohl* of counsel), for respondent. The statement of Hadden was a dying declaration and admissible as such. (*People* v. *Becker,* 215 N. Y. 126; *People* v. *Falletto,* 202 N. Y. 494; *State* v. *Wilkes,* 213 S. W. Rep. 118; *People* v. *Rulia Singh,* 188 Pac. Rep. 987; *Brotherton* v. *People,* 75 N. Y. 159.)

CRANE, J. Walter L. Wilcox, the defendant, on the 11th day of August, 1925, kept a roadhouse on the Bloomingdale road in the town of Wallkill. He had a bar and a barkeeper, named Richard Bender, and sold beer and soft drinks. His housekeeper was a married woman named Eva Oliver, who was not living with her husband. In the early morning of the day mentioned, one Walter Hadden, a resident of Middletown, was shot with a shotgun while on the grounds at the side of the house, and this defendant has been convicted of murder in the second degree for causing his death, and sentenced to State's prison for a term of twenty years to life. The

Appellate Division, in affirming the conviction, did so pursuant to section 542 of the Code of Criminal Procedure, which requires appellate courts to give judgment without regard to errors which do not affect the substantial rights of the parties.

What errors on a trial do affect substantial rights of the parties is many times a very troublesome question. We referred to this in *People* v. *Purtell* (243 N. Y. 273). No human institution is perfect, and we cannot expect perfection upon the trial of criminal cases. As the best minds at times will differ as to what is error, so they will differ as to the materiality of conceded error. The differences among ourselves have taught us to consider questions from every available point of view, and to be slow to overturn the conclusions of others. There comes a time, however, when not to have an opinion and not to express it is to abdicate both the duty and the responsibility of judicial office. I have come to the conclusion that errors were committed upon this trial which affected the substantial rights of the defendant, and require a reversal of the judgment.

To state my reasons for thinking that these errors are too serious to be overlooked I must briefly state the facts of this case, as error is in many instances a relative term. Its seriousness depends upon the nature of the evidence and the strength or weakness of the case. An error in a judge's ruling which would be serious in one case might be ignored as immaterial in another. What effect evidence may have upon the minds of a jury is impossible to determine except as each one of us takes himself as the standard. We all know how at times little things sway the balance and move us to a conclusion; even at times cause us to change a rather fixed conviction. At the best, we can only rely upon our reason and our judgment.

On the night in question, along toward midnight, two young men, one named Otto Snyder, and the other,

1927.]                Opinion, per CRANE, J.              [245 N. Y. 404]

Walter Hadden, were in the defendant's roadhouse drinking beer at its bar. Snyder had trouble or an argument with the bartender. As a witness for the prosecution, he admits it, and states that after this trouble he and Hadden went back to Middletown in an automobile, where he procured his revolver, a .45 automatic, and plenty of ammunition. They drove to Hadden's house, where it may be fairly inferred that Hadden got a gun, a .32 caliber revolver, as he had it at the time of the shooting. Snyder also testifies that he and Hadden returned to the defendant's roadhouse on the Bloomingdale road, and demanded admittance. Lewis, known as Anthony L. Cuneo, a deputy sheriff of Sullivan county, met them as they were trying to get into the place. Wilcox had closed up for the night. Lewis was on his way home when he met Snyder and Hadden, and he testifies: " Snyder came up to me and asked me if I would have a drink with him. I told him that Wilcox had just closed up and put us out, and I did not think we could get in. ' I am going home, and I do not want any more.' He says: ' If we do not get in, we will make him open up — I have got a gun and if he does not give us a drink,' he says, ' I will shoot the place up.' "

These two young men did not heed this warning, pounded at Wilcox's back door and demanded admittance at the point of the revolver. Lewis, or Cuneo, swears that Wilcox came to the door and said to Snyder: " You here again; you had trouble here tonight before, and I told you never to come back or to put your foot on my premises again." Now at this point and under these circumstances as to which there is no dispute, as they are a part of the People's case, the defendant Wilcox had certain rights. He was in his own home which was as sacred in the eyes of the law, although it were a roadhouse, as any other home. If Wilcox were selling beer illegally, that was a matter for the public authorities; it had nothing to do with this case, and gave to Snyder

and Hadden no liberties or privileges. Therefore, I say Wilcox's roadhouse was his home, like any other man's home, which he had a right under the law to protect against intruders. He had a right to prevent Snyder and Hadden from coming into his place and could use force and violence to keep them out, even to the point of killing them, if it were necessary, or he had good reason to believe it to be necessary. When he ordered them away, they should have gone, and when at the time Bender knocked Snyder down and took his pistol away from him, and Wilcox grabbed Hadden and made him drop his pistol by choking him, both Wilcox and Bender were acting within their rights under the law.

When Bender grabbed Snyder, Snyder's pistol went off, which frightened Mrs. Oliver, who was in the house. She said she appealed to the deputy sheriff of Sullivan county to protect her, and to protect Wilcox, whom she thought the two assailants were killing. Up to this point, no one had any firearms except Snyder and Hadden. Snyder pulled himself together and went toward his car; Hadden was running toward the front of the house, from the back to the front, when he was shot from the front porch of the house, or from that direction by shot from a shotgun. All of the above incidents concededly took place on the back porch of the roadhouse. Snyder and Hadden tried to get in the back door. The last seen of Wilcox and of Bender was at the back porch or the rear of the house. Snyder had been disarmed; Hadden, if he had a pistol, had dropped it; both were leaving the premises when this shot from the shotgun came from the front of the house, apparently from the front porch. Who had the shotgun; who fired it? That was the question in this case for the jury to determine. The testimony for the People placed the defendant and Bender at the rear of the house, or on the back porch. Some of the witnesses for the defendant say that Wilcox was in the rear when the shotgun went off; but whether he

was or not, the People failed to prove that he was anywhere else. That was the last seen of him and then he was there concededly struggling with Bender to eject the trespassers.

Wilcox had two shotguns upstairs in his bedroom. Mrs. Oliver says that when Snyder's pistol went off and she became frightened, she asked Lewis, the deputy sheriff, to help them — to protect them, and that she and he went up and got a shotgun; that Lewis took it, and left her at the foot of the stairs. So far as the evidence in this case goes, the only two persons who had a shotgun were either Mrs. Oliver or Lewis.

If the People had proved nothing more than what I have thus far related, the defendant could not have been convicted of any crime. There was nothing connecting him with the shooting. The People's case, therefore, rested with these facts of course as a background, upon an alleged dying declaration of Hadden and an alleged confession made by the defendant Wilcox. These two pieces of evidence, therefore, were all important, both to the People and to the defendant. The case against the defendant we are justified, I think, in saying depended upon the dying declaration and the confession.

Now first as to the dying declaration. Hadden was taken to the Thrall Hospital in Middletown where he was attended by Dr. Samuel Mills who heard a conversation between him and Officer Finn, which is the alleged dying declaration. At the time of his talk with Finn, Hadden was suffering from shock, and evidently bleeding internally. In answer to the public prosecutor, the doctor testified that Hadden was very pale, his finger nails were blue, he was cold to the touch, and was moaning most of the time. He died within about fifteen or twenty minutes after making the statement to Finn. He must have been very weak, and growing weaker. Now what was the statement that the doctor heard? Hadden told Finn that Dick Bender shot him. As

this is important in my judgment, let me quote the testimony.

"Q. Finn asked Hadden who shot him? A. Yes.

"Q. And he said that Dick Bender had shot him? A. Yes, first.

"Q. How many times did he say that Dick Bender had shot him? How many times was that statement made by the deceased, that Dick Bender shot him? A. Several times.

"Q. On all these occasions when he said, 'Dick Bender shot me,' they were in response to questions asked by Finn as to who had shot him? A. Yes."

Hadden at best had only fifteen or twenty minutes to live. He was being asked these questions by Finn. Why did Finn keep repeating the questions, and why did Hadden keep repeating several times that Bender killed him? Was Finn trying to get him to change the statement? Hadden must have been growing weaker every minute. Finally, when the officer said: "Boy, you have been shot with buckshot," Hadden changed his statement and said: "In that case, Walt Wilcox shot me."

"Q. It was only after Officer Finn made some statement that 'You are shot with shot' that the boy changed his statement? A. It was."

Considering these declarations of Hadden as dying declarations, as statements of fact, we have two statements; the first insisted upon and repeated several times that Bender shot him, changed to the defendant, Wilcox, after a suggestion made by the officer. Did the boy change his statement because of the persistence of the officer, to have a little peace in his dying moments? Was his mind clear; did he speak with distinctness? All these things were very important, for it was the heart-spot of the case. From it flowed all the consequences to this defendant. The People had shown on direct examination the physical condition and weakness of Hadden. The defendant's counsel sought to bring

out his mental condition; its weakness, uncertainty and confusion, and at the very threshhold of his attempt, he was stopped by the trial judge on his cross-examination of Dr. Mills. " Q. Is it a fact that at the time this conversation occurred this young man was in a very weak condition? A. He was.

" Q. Close to death? A. Yes.

" Q. His statements were confused, were they not? [Objected to and excluded over exception.]

" Q. Was he in a dazed condition? [Objected to and excluded over exception.]

" Q. I asked you if his statements were more or less confused? [Same ruling and exception.] "

In my judgment this was error of a very substantial nature. I do not say and cannot say that the doctor's answers would have changed the verdict of the jury; who can tell? I do think that the defendant's counsel had the right to examine the doctor on the mental condition of the deceased at the time of the statements, and I know that this was a very important part of the case, as the conviction must rest in part upon the force of the dying declaration. Without the dying declaration, the case against the defendant would be very much weaker.

We now take up the alleged confession of the defendant. At no time did he make an unqualified confession; it was a conditional one. The State troopers came to the place that morning, and one of them, Andrew Grimes, had a talk with the defendant. He found the shotgun which had been used, so he says, and asked the defendant about it. The defendant denied having used it. The officer then reasoned with the defendant by saying that he might just as well admit it, for it might have been a case of self-defense as these men, meaning Snyder and Hadden, had guns. Whereupon, the defendant said: " In that case, I will say I shot him." He did not say that he shot him, but used the expression, " I will say I shot him." Later he told Grimes that he did not do

[245 N. Y. 404]        Opinion, per CRANE, J.        [June,

the shooting — that Tony Lewis did it; that he had told Grimes that he did it to cover up Tony Lewis. He was asked: " Did you tell him on the back porch that he had a perfect defense in self-defense? A. I told him words to that effect, yes."

This was followed by the testimony of the chief of police, John D. McCoach, who appears to have known the defendant and had a talk with him in the locker room at police headquarters. He testified: " When I went in the locker room at police headquarters, I said to him: ' Well Walt, you got the wrong boy last night,' and he said: ' I guess I did,' and then he says: ' Do you mean to say I shot him,' and I said: ' Certainly,' and then he said: ' Hasn't a man got a right to defend his own castle,' and I said: ' Under certain circumstances,' and he said: ' You are wrong.' "

The officer said he committed these words to memory, and yet the frailty of the human memory is made evident by the testimony of the next witness, LaPolt, clerk to the common council and all boards of the city of Middletown, who was present in the station house when the conversation took place between McCoach and Wilcox. He left out at first in his statement the phrase " Under certain circumstances," and makes better sense and a clearer statement by giving the conversation in this fashion. " ' Well, Walt, I think you got the wrong boy last night,' to which Wilcox replied, ' Yes, I guess I did.' The chief proceeded to his own locker and during the interval between the response of Wilcox, the chief arrived at his own locker and then Wilcox said: ' You don't mean to say that I shot the boy,' one word or the other, and the chief said: ' Certainly,' and Wilcox said: ' Well, you are wrong.' " Later he puts in the phrase about defending one's castle, but says that the defendant used it *after*, and not *before* " Well, you are wrong." This transposition of this phrase makes considerable difference, and it at least shows that two men hearing the same thing

at the same time and under the same circumstances could not state it alike, and that one version at least was more favorable to the defendant. McCoach was cross-examined regarding this statement which he says he committed to memory and was asked: " I will read question and answer and ask you if you so testified.

" Mr. Kohl: What are you reading from?

" Mr. Oakes: Grand Jury Minutes.

" Mr. Kohl: I object to it on the ground that it was improper. The Grand Jury minutes only furnished for the purpose of making motions to dismiss the indictments.

" The Court: Objection sustained [exception]."

Mr. Oakes later on again took up this branch of cross-examination and said: " I think perhaps your Honor will rule upon this subject, but in order to protect the rights of the defendant, I desire to make the formal record:

" You testified before the Grand Jury in this matter?

" Mr. Kohl: I object to any reading from the grand jury minutes.

" The Court: Objection sustained.

" Mr. Oakes: Exception.

" Q. At that time was this question asked you and you made this answer? [Same ruling and exception.] "

It appears that this witness before the grand jury had added a very important sentence to the defendant's conversation with him. It was his earliest recollection of the talk with the defendant in the locker room. He swore before the grand jury that the defendant had said: " If I had a gun, there would have been something doing. Hasn't a fellow the right to defend his own castle under certain circumstances? " This was far from a confession; rather a denial, and gives an altogether different meaning to the defendant's conversation. The defendant was entitled to prove that McCoach had so sworn under oath on another occasion. As this case rests almost entirely upon these alleged confessions, this error in my

judgment was not cured by permitting the witness to state that he did not recollect having made such a statement on another occasion.   The defendant was entitled to prod his memory as to his testimony before the grand jury and to make him admit, if possible, that he had made such a statement.   Moreover the defendant having the grand jury minutes was entitled to prove that McCoach had so testified.

Other errors were committed upon this trial which I think would require reversal, but as some of my associates think otherwise I will not discuss them.   Sufficient for the present purpose to say that I have given my reasons why I think we cannot overlook these two errors.   They were substantial, and materially affected the defendant's rights in this particular case.   He is entitled to a new trial.   The judgments should be reversed and a new trial ordered.

CARDOZO, Ch. J., POUND, ANDREWS, LEHMAN, KELLOGG and O'BRIEN, JJ., concur.

Judgments reversed, etc.