# STATE v. JAKE COOPER.[1]

May 19, 1939.

No. 31,987.

[1]Reported in 285 N. W. 903.

334

*Gilbert E. Carlson,* for appellant.

*R. S. Wiggin,* City Attorney, and *Leo P. McHale,* Assistant City Attorney, for the State.

JULIUS J. OLSON, JUSTICE.

Defendant appeals from a judgment convicting him of disorderly conduct under the provisions of a city ordinance of Minneapolis which provides that, "Any person or persons who shall make, aid, countenance or assist in making any * * * disturbance or improper diversion," shall, upon conviction be punished, etc. (Minneapolis Ordinances, 1872-1925, p. 760, § 2.)

Morris Dahl had been employed by J. D. McMillan for some 16 years. His duties consisted of driving his employer's car, helping with the maintenance of the lawn, doing vacuum cleaning in the house, washing windows, scrubbing floors, etc. He described his work thus: "Well, when I wasn't driving I was working in his house as a maid, you might say, doing all kinds of work inside the house." So it is apparent that his duties, aside from driving the car, were necessarily performed at the McMillan house, 239 Clifton avenue, in Minneapolis, an "exclusive residential district." Dahl was discharged the last day of August, 1938. For some time prior thereto he had been, and at the time of discharge was, a member of "Private Chauffeurs and Helpers Union, Local No. 912." He reported his discharge to the union and communicated with one Sawyer, its "business representative," but in the employment of "Teamsters' Joint Council." Sawyer sought to contact McMillan, but the latter refused to see him although informed over the telephone of the nature of the conversation sought to be had. Sawyer "took action to have banners made and put Mr. McMillan on the unfair list." To make these effective he "put pickets out in front of" the McMillan home on September 2, 1938. Defendant, not a member of the union to which Dahl belonged but of "Transfer Division of 544," promptly proceeded to discharge his duties as a picket by carrying a banner some three feet in length on each side of which

was printed the words: "Unfair to Private Chauffeurs and Helpers Union, Local 912." For defendant it was claimed at the trial and not contradicted by the state that the picketing was done because McMillan had discharged Dahl for union affiliation. Defendant arrived at the McMillan residence at two o'clock and continued picketing until 4:15 p. m. when he was arrested and charged with disorderly conduct. There is no evidence that other people had gathered there nor was any showing made that disorder occurred or was threatened. As a matter of fact, when the officer came to the scene he found no one other than the accused there.

Defendant puts before us as the only question here: "May an employe working in a private residence located in a residential district peacefully picket such residence to enforce economic demands?" He contends that if the answer be in the negative the "employes working in a domestic capacity would be denied the right of picketing, which is a right given to other industrial employes."

■ The validity of defendant's argument depends upon whether a home, exclusively used as such, may be said to be a place for the carrying on of an industrial or a business enterprise. Obviously the home cannot be so classified.

"The home is an institution, not an industry. * * *

"The home is maintained as an abiding place, and the servants at the home help to make it habitable; but persons employed in manufacturing establishments or large hotels, which places are conducted for gain, are not domestic servants within the meaning of the workmen's compensation act, but are employed in industry and do come within the meaning and avowed purposes of the act." Barres v. Watterson Hotel Co. 196 Ky. 100, 102, 103, 244 S. W. 308, 309, 310.

As pointed out in Eichholz v. Shaft, 166 Minn. 339, 208 N. W. 18, the object of the compensation act was to place upon industry, operated for profit, the burden of loss from injuries to employes engaged therein; that as such it was considered a part of the expense of operating the industry but that the act was not intended

to place such burden and expense upon owners of homes not maintained for pecuniary gain. And the same result was reached in Anderson v. Ueland, 197 Minn. 518, 521, 267 N. W. 517, 518, 927, where we said:

"* * * the only criterion for determining whether or not one is a domestic employe or servant within the meaning of the expressed exception, * * * [as to domestic servants] which would be commensurate with the original intent and purpose of the workmen's compensation act is whether or not the particular activity or activities of the employe are related to and in furtherance of the maintenance of the home."

The court concluded that the test for determining whether an employe should be excluded because of domestic employment has for its basis "the relation of the work or labor done to the upkeep of the home and the consequent comfort of those dwelling therein." And the court thought it "not too difficult" to apply that rule, as its application "accomplishes what we believe to be the purpose of this particular exception to the act—namely, the exemption from its burden of the homeowners, who receive no pecuniary profit from the maintaining of dwelling establishments."

The court was of opinion that "the home is a sacred place for people to go and be quiet and at rest and not be bothered with the turmoil of industry," and that as such it is "a sanctuary of the individual and should not be interfered with by industrial disputes." We think the court's conception of "home" as "a sanctuary of the individual" is sound. The word is defined as, "the abiding place of the affections, esp. domestic affections"; as "the social unit formed by a family residing together in one dwelling," and as "an organized center of family life." Webster's New International Dictionary (2 ed.) 1935.

■ "An enterprise not conducted as a means of livelihood, or for profit, does not come within the ordinary meaning of the terms 'business,' 'trade,' or 'industry.'" City of Rochester v. Rochester Girls' Home (Sup. Ct.) 194 N. Y. S. 236. (For other definitions, see Wd. & Phr. [1, 2, 3 Ser.] Business; Industry; Trade.)

■ We can find no basis for defendant's contention that L. 1933, c. 416, § 12 (3 Mason Minn. St. 1938 Supp. § 4260-12) has any application. The obvious purpose of that chapter (§ 2 of which declares the public policy of the state) is to give employes "full freedom of association, self-organization, and designation of representatives" of their own choosing; that they shall be, in the accomplishment of these purposes, "free from the interference, restraint, or coercion" of their employers or their agents. The title of the act discloses its purpose, *i. e.,* to impose a duty upon the court in matters involving the issuance of restraining orders and injunctions in labor disputes. Clearly, we think its objectives relate solely to *industrial* disputes. Holding, as we do, that there is here no question involving an industrial employe's right to strike, nor any question relating to industrial conflict between capital and labor, the employe not being industrially employed, the nonapplicability of the mentioned act is apparent. There was here no strike, nor was there any "industrial" conflict.

■ When both parties rested defendant moved for a dismissal on the ground that a "labor dispute" was involved; "that this was his [Dahl's] headquarters, this was where he worked, he operated out of there for 16 years. There was no other place he could picket; therefore, we believe we have a right to picket under those conditions."

We think State v. Zanker, 179 Minn. 355, 229 N. W. 311, and State v. Perry, 196 Minn. 481, 265 N. W. 302, furnish adequate guides to decision here. True, in both of these cases the carrying of banners provoked real disturbance and "quite a bit of excitement." In that respect only is there a distinction. Defendant's conduct was likely to arouse anger, disturbance, or violence. That there was no outburst of violence was not due to his behavior but to the fortunate circumstance that he was arrested and taken away before any trouble broke. That defendant's presence at the McMillan home carrying this banner was as likely to provoke trouble and breach of the peace as the "bannering" in the cited cases seems clear. At least the court could so find, and that is enough.

■ There remains only for decision the question of whether the evidence justifies the conviction. While it is true, as we have seen, that the facts in the two cases cited are not exactly parallel with the facts here appearing, yet we think the test there applied is applicable here. It is stated thus (179 Minn. 357, 229 N. W. 312):

"Conduct is disorderly in the ordinary sense when it is of such nature as to affect the peace and quiet of persons who may witness the same and who may be disturbed or provoked to resentment thereby." Or, as stated further: "The probable and natural consequences of the conduct is the important element."

As to modern statutes and ordinances relating to disorderly conduct, "it may be said in general that words and acts which tend to disturb the peace * * * of the community, or of a class of persons, or of a family, are punishable." 18 C. J. p. 1216, [§ 2]B, and cases under note 12. And in several jurisdictions it has been held that such conduct "as in the opinion of the magistrate tends to a breach of the peace" is punishable; "and even in the absence of such a statutory definition it is generally a question for the magistrate whether or not the particular act complained of is comprehended within the expression 'disorderly conduct.'" *Id.* and cases under notes 16 and 17; 8 R. C. L. p. 285, § 306, and cases under note 7.

We are of opinion and so hold that it was for the court to determine whether upon this record defendant was guilty, and that its findings in that behalf should not be overturned. The judgment and sentence are therefore affirmed.

GALLAGHER, CHIEF JUSTICE (concurring specially).

I concur in the result but for different reasons than those assigned in the majority opinion. Defendant was convicted of violating an ordinance of the city of Minneapolis which reads:

"Sec. 2. Any person or persons who shall make, aid, countenance or assist in making any noise, riot, disturbance or improper diversion, and all persons who shall collect in bodies or crowds in said city, for unlawful purposes or to the annoyance or disturbance of

the citizens or travelers, shall, for each offense, on conviction before the Municipal Court of the city of Minneapolis, be liable to the same fine and punishment provided for in section 1 of this ordinance." Minneapolis City Charter and Ordinances, 1872-1925, p. 760, passed May 7, 1887.

Aside from a statement in defendant's testimony to the effect that at the time of his arrest he "was picketing this Mr. McMillan's for firing a chauffeur for union affiliation," which statement appears to be a conclusion based upon hearsay evidence, the record is barren of any testimony from which it could be found that a labor dispute existed at the time involved. The only other testimony from which it might be inferred that there was a labor controversy was a statement by the witness Morris Dahl that he had been employed by Mr. McMillan for about 16 years and was discharged by McMillan a few days before the picketing was done, and another by the witness Ray L. Sawyer, purporting to be a union representative, to the effect that he had contacted McMillan by telephone and that the latter refused to see him. For aught the record shows, the discharge of Dahl might have been for any one of many valid reasons entirely foreign to labor controversies.

Assuming for the moment that the provisions of 3 Mason Minn. St. 1938 Supp. § 4260-1 to 4260-23, pertaining to the granting of injunctions in labor disputes, are otherwise applicable, I do not see how, on the showing made, the restrictions contained in the act can be applied.

The record failing to show a labor dispute, it is not difficult to reach the conclusion that to walk "up and down" in front of a person's home for two hours in the middle of the afternoon carrying a banner entitled: "Unfair to Private Chauffeurs and Helpers Union, Local 912," constitutes a violation of the ordinance referred to. It at least constitutes an "annoyance or disturbance of citizens or travelers" within the meaning of the ordinance.

That the trial court may have concluded that the question of the right to picket a place used exclusively as a home was involved and may have let that consideration enter into its decision does not

alter the situation or provide the proof, now lacking, as to the existence of a labor dispute.

For the reasons stated, it does not seem to me that the question of the right to picket a place used exclusively as a home is before us in this case and that decision with reference thereto should be reserved until the issue is properly before us. I therefore join in the affirmance without commitment to the principles enunciated in the majority opinion.

STONE, JUSTICE (concurring).
I concur in the opinion of Mr. Chief Justice Gallagher.

PETERSON, JUSTICE (dissenting).
The only act committed was peaceful picketing. Defendant did not accost or interfere with any person. He was alone on the street. He was found guilty of disorderly conduct for doing an act which was not unlawful and which he had a right to do.

■ Peaceful picketing is lawful. In Steffes v. Motion Picture M. O. Union, 136 Minn. 200, 202, 161 N. W. 524, we held that it was not unlawful in a labor dispute for a picket to walk up and down the street in front of plaintiff's place of business displaying a banner that plaintiff was unfair to organized labor. We said:

"The term 'unfair' as used by organized labor has come to have a meaning well understood. It means that the person so designated is unfriendly to organized labor or that he refuses to recognize its rules and regulations. It charges no moral shortcoming and no want of business capacity or integrity."

The authorities are practically unanimous that picketing becomes unlawful only when it ceases to be peaceful and is accompanied by acts of violence, intimidation, threats, and breach of the peace. Nann v. Raimist, 255 N. Y. 307, 174 N. E. 690, 73 A. L. R. 669; Wise Shoe Co. Inc. v. Lowenthal, 266 N. Y. 264, 194 N. E. 749; Bayonne Textile Corp. v. American Fed. of Silk Workers, 116 N. J. Eq. 146, 172 A. 551, 92 A. L. R. 1450; Goldfinger v. Feintuch, 276 N. Y. 281, 11 N. E. (2d) 910, 116 A. L. R. 477.

In Exchange Bakery & Restaurant, Inc. v. Rifkin, 245 N. Y. 260, 263, 157 N. E. 130, 133, Judge Andrews, in reversing the lower court said: " 'Picketing' connotes no evil." In Pope Motor Car Co. v. Keegan (C. C., N. D. Ohio) 150 F. 148, the court said that peaceful picketing is in no sense unlawful. The courts have held that peaceful picketing does not constitute disorderly conduct. In People v. Phillips, 245 N. Y. 401, 157 N. E. 508, a conviction of disorderly conduct was reversed where the proof showed that defendant with others marched up and down in front of complainant's place of business in downtown New York. In People v. Nixon, 248 N. Y. 182, 161 N. E. 463, evidence that defendant and others walked four abreast up and down a sidewalk 12 feet wide in front of complainant's place of business, creating no special excitement or disturbance, was held not to justify a conviction of disorderly conduct. Accord, People ex rel. Broder v. Heller, 166 Misc. 155, 2 N. Y. S. (2d) 352. In City of St. Louis v. Gloner, 210 Mo. 502, 109 S. W. 30, 15 L.R.A.(N.S.) 973, 124 A. S. R. 750, it was held that peaceful picketing was in no sense unlawful and that an ordinance making peaceful picketing punishable as disorderly conduct was unconstitutional upon the grounds that it deprived the picketer of his liberty without due process of law. In the Perry (196 Minn. 481, 265 N. W. 302) and Zanker (179 Minn. 355, 229 N. W. 311) cases there was not only picketing but disorder and breach of the peace. They did not involve cases of peaceful picketing and are not in point. In any aspect of this case, we are bound to hold as a matter of law that defendant was not guilty of disorderly conduct. It will not do to say that a finding of disorderly conduct is conclusive in all cases. If there is no evidence to sustain such a finding, it is our duty to set aside the conviction. The view that a finding of disorderly conduct is conclusive was repudiated in People v. Phillips, *supra,* in the following language [245 N. Y. 403, 157 N. E. 509]:

"It seems to rest upon the erroneous idea expressed by the magistrate that 'if there is no strike and he is marching up and down in front of this place of business he is guilty of disorderly conduct.' " See also People v. Nixon, *supra.*

■ The conviction cannot be sustained without ignoring L. 1933, c. 416, 3 Mason Minn. St. 1938 Supp. §§ 4260-1 to 4260-23, which limits the jurisdiction of courts to issue injunctions in labor disputes. It is sometimes called the state Norris-LaGuardia Act because it is practically a copy of it. Section 4-e [4260-4(e)] prohibits the issuance of an injunction to restrain giving publicity to the existence of the facts involved in a labor dispute "whether by advertising, speaking, *patrolling*, or by any other method not involving fraud or violence." Such legislation is deemed to recognize the lawfulness of the conduct which it exempts from injunctional restraint. Fenske Bros. Inc. v. Upholsterers Int'l Union, 358 Ill. 239, 193 N. E. 112, 97 A. L. R. 1318. In New Negro Alliance v. Sanitary Grocery Co. 303 U. S. 552, 58 S. Ct. 703, 82 L. ed. 1012, picketing of a store in a negro neighborhood in Washington, D. C. with placards advertising that the owner did not employ negroes and advising others to buy where negroes could work was held to be lawful under § 13 of the Norris-LaGuardia Act (29 USCA, § 113), which is substantially the same as § 12 of our act. Since peaceful picketing is lawful under the statute, it cannot be held to be disorderly conduct. See Local Union No. 26, etc. v. City of Kokomo, 211 Ind. 72, 5 N. E. (2d) 624, 108 A. L. R. 1111.

■ The fact that the picketing was in front of the employer's residence does not make the act unlawful. The ordinance has not prescribed zones within which certain acts shall be deemed disorderly conduct. It is city-wide in its application. If an act is unlawful in one section of the city it is unlawful in every other part. The ordinance makes no distinction between business and residential, or different kinds of residential, districts. That the employer's residence was involved is only a collateral circumstance. Even if, as stated in People v. Nixon, 248 N. Y. 182, 185, 188, 161 N. E. 463, 465, 466, the defendant was guilty of bad taste and "atrociously bad manners," that would not make his acts unlawful, for "as yet bad manners have not been made punishable by imprisonment," and "of course, no one urges that distinction may be based merely upon difference of social or economic position."

In Senn v. Tile Layers Protective Union, 301 U. S. 468, 57 S. Ct. 857, 81 L. ed. 1229, picketing of an employer's home with banners proclaiming that he was unfair to organized labor was upheld as inherently unobjectionable. There the record shows that the employer had a desk in his dining room, kept his tools in his garage, and worked on jobs away from his home with one or two employes. Here the employer's home was the place of employment. The cases are not distinguishable. The courts have almost uniformly held that the home is not exempt from peaceful picketing. Picketing of homes has been enjoined only when conducted with intimidation, threats, or breach of the peace. Knudsen v. Benn (C. C. Dist. of Minn. 5th Div.) 123 F. 636; Christensen v. Kellogg S. & S. Co. 110 Ill. App. 61; State Line & S. R. Co. v. Brown, 11 Pa. Dist. Rep. 509; So. California I. & S. Co. v. Amalgamated Assn. of I. S. & T. Workers, 186 Cal. 604, 200 P. 1. A. R. Barnes & Co. v. Chicago Typo. Union No. 16, 232 Ill. 424, 83 N. E. 940, 14 L.R.A.(N.S.) 1018, 13 Ann. Cas. 54, is the only case I have been able to find in which an injunction was upheld prohibiting the picketing of employes' homes. That case is based upon the rule that all picketing, whether peaceful or not, is unlawful. It is contrary to the overwhelming weight of authority and our rule stated in the Steffes case, *supra.*

Where picketing of homes has been enjoined, the injunctions have been modified to restrain only acts of intimidation, threats, and violence and to permit peaceful picketing. In Iron Moulders' Union v. Allis-Chalmers Co. (7 Cir.) 166 F. 45, 47, 52, 20 L.R.A.(N.S.) 315, a decree prohibiting strikers from picketing "the *homes* or boarding houses or *residences* of said complainant's employes" was modified so as to prohibit such picketing only when conducted "in a threatening or intimidating manner." Peaceful picketing of employes' homes was permitted. A similar modification of an injunction was made in A. L. Reed Co. v. Whiteman, 238 N. Y. 545, 144 N. E. 885. The rule which permits peaceful picketing of an employe's home applies equally to the employer. Here, as in Senn v. Tile Layers Protective Union, *supra,* the primary grievance was against the employer.

In disorderly conduct cases the rule is that conduct otherwise lawful is not rendered unlawful because it relates to a home. In People v. Weiler, 179 N. Y. 46,. 71 N. E. 462, 1 Ann. Cas. 155, it was held that a licensed private detective was not guilty of disorderly conduct in shadowing and following a person to, and then watching him in, his home, where he did not speak to or come in contact with any person or otherwise commit any offensive or disorderly act. In accord, People v. Clark (Co. Ct.) 164 N. Y. S. 137. The fact that the act was committed in the home may be the very thing that will prevent it from being disorderly conduct as where the charge is for speaking vile and abusive language. See Zecca v. Smith, 5 N. J. Misc. 1044, 139 A. 423.

I think that we should reverse the conviction.

MR. JUSTICE HILTON, being incapacitated by illness, took no part.

