# HOWARD W. STEINMETZ v. OTTO KLABUNDE.

113 N. W. (2d) 444.

January 19, 1962—No. 38,307.

*Sigwel Wood,* for relator.
*Maurice O. Nelson* and *Powell & Dessert,* for respondent.

NELSON, JUSTICE.

Certiorari to review an award of compensation by the Industrial Commission to Howard W. Steinmetz against his employer, Otto Kla-

bunde, who owns and lives upon a 360-acre farm tract, 5 miles south of Mahnomen, Minnesota. The principal question presented is whether Howard W. Steinmetz was a "farm laborer" within the exemption provided by the Workmen's Compensation Act.

Relator, Otto Klabunde, has farmed the 360-acre tract for many years. In the spring of 1958 he and his son, Gordon, who had been discharged from the Navy in the fall of 1957, joined together on a 50-50 basis to operate the 360-acre home farm and 540 additional rented acres. All of the rented land was located in the area, 60 acres being adjacent to Mahnomen, 80 acres near Waubun, and 400 acres northwest of Mahnomen. In order to properly farm this large number of acres, they equipped themselves with a complete line of farm machinery including three tractors, a combine, a hay bailer, two trucks, a cutter, a blower, a cornpicker, a corn planter, two plows, an elevator, a swather, and other similar farm machinery. While their farming of the 900 acres consisted principally of grain farming, they also raised livestock and poultry on the home farm. This necessitated filling the silo on the home farm each year as a part of their operations.

Three neighbors, Lawrence Buschette, Ivan Buschette, and Bernard Stalboerger, in 1958 and 1959, helped to cut the corn on the Klabunde farm and the Klabundes, by way of exchange, cut the corn for their three neighbors. In this connection the Klabundes furnished one tractor, one corn chopper, one blower, one pick-up truck, and two wagons. The farmer with whom exchange work was being done furnished one tractor for the blower, one tractor for hauling a wagon, and three men. The Klabundes furnished only one man, the driver of the tractor pulling the corn chopper. The operation at the farm silos required one man to operate the blower, one man in the silo, and one man hauling the wagons to and from the field, transporting the chopped corn to the silo. The Klabundes exercised no control over the men or machinery furnished by the farmer whose silo was being filled.

About September 10, 1959, relator asked Howard W. Steinmetz, the employee and respondent herein, if he wanted to work for him, running the corn chopper. Howard informed relator that he would be available until September 22, when he expected to go to work for a commercial thresherman. He agreed to work at $1 per hour. On the

morning of September 16, 1959, Howard Steinmetz and Gordon Klabunde went to the Ole Hovde farm. About 10 a. m. Howard left the Hovde farm and went to his own farm for the purpose of combining millet. He did not return to the Hovde farm until 8 or 9 o'clock that evening, when he went into the field and began operating the chopper. After he had worked an hour and 15 minutes, he injured his right arm in the chopper while attempting to extricate soy beans and corn that had clogged the machine. His injury was severe, resulting in amputation of the right arm between the elbow and wrist. Following the accident he was taken to the hospital, where Dr. W. R. Koons attended him. He was discharged from the hospital on September 21, 1959, and eventually resumed farming with the aid of an artificial hand and hook. Relator paid him $56 for the work he had done prior to the accident, and a collection was taken up by the neighbors which was sufficient to pay for hospital and doctor bills, artificial hand, and other items of expense.

When relator entered into the arrangement with Howard Steinmetz, relator was about to begin chopping corn for Howard's father, Wesley Steinmetz. The employment was limited to cutting the corn on three farms with no set hours as to time of work and with the opportunity for the employee to leave at any time to do his own farm work. Howard was a young man, 20 years of age, who had farmed his own 160 acres since 1958 and who had done other work when it was available.

Relator raised corn on 180 acres of the farmland which he operated in 1959; while he did not chop all of his own corn for silage, he put in about 10 to 12 hours with the cutter on his own farm. The pressure on him to assist his neighbors in their corn cutting was based upon the fact that he was equipped with the necessary machinery. A more impelling reason for assisting them was that the frost had hit the corn in that community and it was imperative to get the cutting done immediately to preserve it for ensilage. It is clear from the record as well as the testimony of relator that he had not invested in a corn chopper for the purpose of entering into the business of cutting corn for others. The going rate charged by one in the business was $12.50 per hour in that vicinity while relator only charged $9 per hour. Re-

lator went no further than to help out those neighbors who pressured him for assistance. He did not solicit any of the cutting jobs.

The Klabundes kept track of the time the cutter was used on farms other than their own, and it appears that the places worked and the actual corn-cutting hours from September 10 to September 16, 1959, are as follows:

| September 10, 11, | Wesley Steinmetz, | 6 hours, 20 minutes; |
|---|---|---|
| September 11, 12, | Gilbert Bjerkin, | 6 hours, 30 minutes; |
| September 12, | Benny Peterson, | 7 hours, 15 minutes; |
| September 12, 13, | Earl Steinmetz, | 5 hours, 50 minutes; |
| September 13, 14, | Norbert Dobmeyer, | 5 hours, 50 minutes; |
| September 14, | Cletis Lieble, | 7 hours, 45 minutes; |
| September 14, 15, | Leo Kaiser, | 8 hours; |
| September 15, | Donald Kaiser, | 4 hours, 30 minutes; |
| September 16, | Ole Hovde, | 8 hours. |

Howard was injured on September 16, 1959. After that, relator cut corn for other neighbors, as follows:

| September 18, 19, | Lawrence Buschette, | 13 hours; |
|---|---|---|
| September 20, 21, | Bernard Stalboerger, | 11 hours, 30 minutes; |
| September 21, 22, | Ivan Buschette, | 14 hours; |
| September 23, 24, | Chris Thelen, | 15 hours. |

The record indicates that relator performed six chopping jobs in 1958—two for relatives, Steinmetz and Bjerkin, and four for neighbors, Ivan and Lawrence Buschette, Stalboerger, and Hovde. The cutting for Stalboerger and the two Buschettes involved exchange of work. Bjerkin testified that relator assisted him in cutting his corn because of their family relationship. The Buschettes testified that they sought the relator's assistance in cutting their corn and that it was in large part an accommodation because the charge made by relator was not compensatory for the equipment furnished. Stalboerger testified that the work done for him was on an exchange basis. There was further testimony that the charge of $9 per hour was worked out to provide for the cost of the equipment each furnished on the job.

In 1959 relator did work on nine farms up to the date of em-

ployee's injury, which work had consumed seven days, the work done averaging seven hours per day. When he commenced cutting corn for his neighbors in 1959 he had only contemplated assisting Wesley Steinmetz, a relative and employee's father; Gilbert Bjerkin, a nephew; and Earl Steinmetz, a nephew. Other neighbors came in succession, pressuring for help until the number of farms he assisted in 1959 reached a total of thirteen. The record indicates the manner in which additional jobs came about. While relator's equipment was being used on the Wesley Steinmetz farm, the Kaisers came to that farm and persuaded him to cut for them. When relator was cutting at the Peterson and Earl Steinmetz farms, Dobmeyer and Lieble talked relator into cutting for them. Relator had never made or kept a list of customers or planned doing these jobs in advance.

The record indicates that a commercial thresherman had in previous years cut corn for these farmers but he refused to take on their jobs in 1959. This resulted in their turning to relator since he was the only one in the vicinity who possessed the necessary machinery and equipment to aid them in time to save their corn for silage. The farmers for whom relator cut corn in 1959 either had farmland abutting land farmed by him or lived within 5 miles of land farmed by him. The farmers who testified indicated that he had done them a favor by assisting them in cutting their corn in 1959; that he had accommodated them under the circumstances. The repair bill for relator's machinery and equipment used was shown to be $250.26. There was also testimony as to depreciation. Relator argues that allowing $1 per hour for labor the total cost to the relator was $10.60 per hour while cutting corn for other farmers.

After a hearing on employee's claim petition a referee's decision was filed in employee's favor. The Industrial Commission affirmed the referee's findings and the employer filed his petition for certiorari in this court. The relator contends that he was not engaged in the business of cutting corn commercially as an occupation; that he was not engaged in doing that work for his neighbor farmers for a livelihood, or essentially for gain or profit; but that he did the work upon the insistence of his relatives and neighbors at the time in question in large part as an accommodation for them. He further contends that he an-

nually engaged in doing his own corn picking and shredding and that he only casually did such work for other farmers in the same community and this mostly as an accommodation or on an exchange-work basis. Relator, therefore, contends that the Industrial Commission was in error when it held that the work he did for his neighbors was commercial and not casual, that it was not farm work, and that the employee was not a farm laborer, all within the meaning of the Workmen's Compensation Act.

Relator cites as controlling the following cases: Partridge v. Blackbird, 213 Minn. 228, 6 N. W. (2d) 250, 12 Minn. W. C. D. 404; Amundsen v. Poppe, 227 Minn. 124, 34 N. W. (2d) 337; State v. Cooper, 205 Minn. 333, 285 N. W. 903, 122 A. L. R. 727.

Relator contends that whether an employee comes within the exceptions to the application of the Workmen's Compensation Act prescribed by Minn. St. 176.041[1] must be determined by the whole character of employment.

■ In Partridge v. Blackbird, *supra,* this court held that the nature of the employment taken as a whole is the test as to whether an employee is a farm laborer within the exceptions to the application of the Workmen's Compensation Act. The principal question presented in that case was whether or not Partridge was a "farm laborer." This court reversed the Industrial Commission[2] which had awarded com-

---

[1]Section 176.041 provides: "This chapter does not apply to any * * * farm laborers, or persons whose employment at the time of the injury is casual, and not in the usual course of the trade, business, profession, or occupation of his employer. * * *"

[2]Commissioner Debel of the Minnesota Industrial Commission dissented to the commission's decision, concisely summing up the situation as follows: "I cannot, therefore, agree to affirm the finding of the referee that this corn-picking 'constituted a commercial enterprise and was not farm labor.' In my opinion it was not a business or a commercial enterprise. It was done merely as an incident to his own farm operations. It was such a service as most farmers will occasionally do for a neighbor for a consideration.

"Farmers are exempt from liability under the Workmen's Compensation Law. This immunity should not be swept from under their feet on evidence as slight as this. To permit this to be done would render every farmer

pensation to Partridge against his employer, Blackbird, saying (213 Minn. 230, 6 N. W. [2d] 251, 12 Minn. W. C. D. 406):

"* * * We hold that the evidence compels a finding that Partridge was a farm laborer and that Blackbird was not engaged in an independent commercial enterprise or business. In operating his rather extensive acreage, Blackbird had the necessary equipment for so doing, whereas his neighbors and other farmers in his vicinity, with perhaps less acreage, naturally sought to hire work done with labor-saving machinery which they did not possess. Sometimes they paid cash for such service and sometimes paid in exchange of work. Certainly these incidental jobs did not constitute a commercial enterprise. It is the policy of the legislature to exempt farm labor from the compensation act. We should not go contrary to that policy by interpreting into the act exceptions that are not there."

In Peterson v. Farmers State Bank, 180 Minn. 40, 41, 230 N. W. 124, this court said:

"A workman is not a farm laborer simply because at the moment he is doing work on a farm; nor because the task on which he is engaged happens to be what is ordinarily considered farm labor. The employe of an implement dealer does not become a farm laborer while engaged in correcting the behavior of a self-binder in the grain field of the owner, a farmer and customer of the dealer. Nor would the employe of a well digger become a farm laborer while stabling horses used on the drilling outfit. But a farmer's hired man would not cease to be a farm laborer while adjusting harvesting machinery or

insecure in his rights under the law. Who can then know when it will be his turn. In principle it should make no difference whether the work involved is corn-picking, plowing, harvesting, hauling cream, trucking, or the use of any of the more expensive pieces of mechanical farm equipment, which the generality of the farmers in a community may not possess. The result would be that these farms would all be forced to go to the expense of procuring workmen's compensation insurance coverage, and to thus 'elect' to come under the provisions of the Workmen's Compensation Law. A farmer should be held liable only when he engages in a business separate and distinct from his farming."

stabling the horses of a contractor drilling a well on the place. The modern farm laborer doubtless does much work on the rapidly increasing electrical equipment on farms. He continues a farm laborer while he does it. But an electrician sent out from town to do the same thing would not become a farm laborer for the occasion. So also a farm laborer does not step out of his own part while doing carpenter work for his farmer employer in the repair of farm buildings. Neither does the carpenter who comes onto the farm for the job of carpentry and nothing more. One continues a farm laborer and the other does not become one."

In Hebranson v. Fairmont Creamery, 187 Minn. 260, 262, 245 N. W. 138, 139, we said:

"* * * the nature of the employment is the test rather than the particular item of work he is doing when injured."

In Oberg v. DuBeau, 202 Minn. 476, 479, 279 N. W. 221, 223, we said:

"* * * The whole character of Oberg's employment must be looked to to determine whether he was a farm laborer."

Relator contends that the commission improperly held that he was a commercial thresherman or corn cutter within the definition in Minn. St. 176.011, subd. 5. He argues that he was not engaged in going from place to place, shredding or cutting corn as a business; that he is a farmer who owns a shredding machine, not engaged in such business generally but doing his own shredding and casually doing such work for other farmers in his community when implored to do so, or when exchanging work with neighboring farmers.

Minn. St. 176.011, subd. 5, provides as follows:

" 'Commercial thresherman' means a person going from place to place threshing grain or shredding or shelling corn as a business, but does not include a farmer owning a threshing, shredding, or shelling machine not engaged in such business generally and doing his own threshing, shredding, or shelling and casually doing such work for other farmers in the same community or exchanging work with another farmer."

Minn. St. 176.011, subd. 12, provides: " 'Farm laborer' does not include an employee of a commercial thresherman * * *."

Webster's New International Dictionary (2 ed.) (1947) p. 362, defines "business" as:

"Any particular occupation or employment habitually engaged in, esp. for livelihood or gain."

■ While experience has taught that no exact definition of the term "casual employment" is advisable, it does indicate work which comes without regularity and is more or less occasional and incidental.

In Billmayer v. Sanford, 177 Minn. 465, 467, 225 N. W. 426, 427, this court said:

"* * * Where the employment cannot be characterized as permanent or periodically regular, but occurs by chance, or with the intention and understanding on the part of both employer and employe that it shall not be continuous, it is casual."

■ The circumstances under which relator engaged in the corn cutting were unusual. Because relator was engaged in a larger farming operation than his neighbors, he had the extra necessary machinery. Since the corn was frozen, it was essential that the neighboring farmers who applied to him for assistance needed to have their corn cut immediately in order to preserve at least a part of its value as silage. It is clear that, in the main, those were the reasons relator was approached by his relatives and neighboring farmers to do this work in the late summer and fall of 1959. Relator when testifying stated the essence of the matter as follows:

"Q. And you could have referred them to Moen, if you didn't want the business?

"A. We told them to get anybody they could.

"Q. But the point is that you didn't have to do the work?

"A. That is right, if you wanted to be real mean enough to tell the people to let your corn stand, we don't want to go out there.

"Q. But you did take the work on?

"A. Yes, we helped.

"Q. You did it?

"A. Yes.

"Q. To the best of your ability?

"A. We done the best."

In an early decision entitled State ex rel. Bykle v. District Court, 140 Minn. 398, 400, 168 N. W. 130, 131, L. R. A. 1918F, 198, 199, Mr. Justice Hallam speaking for this court said:

"* * * Much farm work is done by the use of complicated machinery. There are tractor plows, self-binders and even combination harvester-threshers by means of which harvesting and threshing are done as one operation. These and other operations may be done for others by one who is able to own the more complicated and expensive machinery. But it is all, nevertheless, farm work and the employee who does such work is a 'farm laborer' within the meaning of the Compensation Act."

We think the injured employee in the instant case is a farm laborer within the exceptions contained in § 176.041.

The legislature has defined certain exceptions to the exemption of farm laborers, and as we see it none of them applies to the case at bar. If there is to be an amendment to the statute regarding farm labor, that prerogative lies with the legislature. The decision of the commission is reversed and the award annulled.

Reversed.